972 F.2d 1364
 61 USLW 2107, 76 Ed. Law Rep. 947
 D.R., a Minor Child, by Her Parent and Natural Guardian,
L.R., and L.R., Individually and in Her Own Right,
Appellants, No. 91-1136
v.
MIDDLE BUCKS AREA VOCATIONAL TECHNICAL SCHOOL, William
Goode, James C. Bazzel, Martha Richino, Susan Peters, Bucks
County Intermediate Unit No. 22, Christina Tuttle, Penn
Ridge School District, Charles Fambro, Fred Freeman, James
A. Gallagher, Brian Miller, Marc R. Ratcliffe, James M.
Sperling, Lester Sutphin.
L.H., Bucks County, Pennsylvania, Appellant, No. 91-1137
v.
MIDDLE BUCKS AREA VOCATIONAL TECHNICAL SCHOOL, and William
Goode and James C. Bazzel and Martha Richino and Susan
Peters and James A. Gallagher and Brian Miller and Marc R.
Ratcliffe and James M. Sperling and Lester Sutphin.
 Nos. 91-1136, 91-1137.
 United States Court of Appeals,
Third Circuit.
 Argued July 16, 1991.
Reargued In Banc May 6, 1992.
Decided Aug. 11, 1992.
 
 Thomas B. Rutter (argued), Rutter, Turner, Solomon & Dipiero, Philadelphia, Pa., for appellants.
 John E. Freund, III, King, McCardle, Herman & Freund, Allentown, Pa., Larry D. Jackson, Harris & Silverman, Eric A. Weiss, Barbara A. Subkow, Liebert, Short & Hirshland, Philadelphia, Pa., Andrew L. Braunfeld, Masterson, Braunfeld, Himsworth & MaGuire, Norristown, Pa., Robert G. Devine, James J. Donohue, White & Williams, Philadelphia, Pa., Andrew E. Faust (argued), Curtin & Heefner, Doylestown, Pa., Edwin F. McCoy, David B. Kline, LaBrum & Doak, Joseph M. O'Neill, Sean X. Kelly, Marks, Kent & O'Neill, Philadelphia, Pa., for appellees.
 Michael I. Levin, Cleckner and Fearen, Willow Grove, Pa., Stuart L. Knade (argued), Cleckner and Fearen, Harrisburg, Pa., for amicus curiae Pa. School Bd. Ass'n.
 Argued July 16, 1991
 Before: SLOVITER, Chief Judge, GREENBERG and SEITZ, Circuit Judges.
 Reargued In Banc May 6, 1992
 Before: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Circuit Judge.
 
 
 1
 This appeal presents us with a classic case of constitutional line drawing in a most excruciating factual context.
 
 
 2
 Plaintiffs, D.R., a minor child, by her parent, L.R. and L.H., both public high school students, as well as L.R. in her own right,[1] appeal the decision and order of the district court dismissing their amended complaints against Middle Bucks Area Vocational Technical School ("Middle Bucks"), Penn Ridge School District ("Penn Ridge"), Bucks County Intermediate Unit No. 22 ("Unit No. 22"), and individually named teachers and officials[2] ("school defendants"). Claims were also asserted against seven male students. Only two students, James Gallagher and Marc Ratcliffe, appeared, but because all seven were allegedly involved in the wrongful conduct we shall include all of them in referring to "student defendants."[3] Future references to "plaintiffs" will apply to D.R., by her parent, and L.H. unless otherwise noted.
 
 
 3
 The amended complaints pleaded claims under 42 U.S.C. §§ 1983 and 1985(3) (1988), as well as state law claims. Federal jurisdiction was invoked under 28 U.S.C. §§ 1341 and 1343 (1988),[4] and pendent jurisdiction over the state law claims. This court has jurisdiction pursuant to 28 U.S.C. § 1291 (1988).
 
 I. AMENDED COMPLAINTS
 
 4
 Plaintiffs were two female students in a graphic arts class at Middle Bucks.[5] They allege that while attending the arts class during the 1989-90 school year, several male students in the same class physically, verbally and sexually molested them. This conduct took place primarily in the unisex bathroom and a darkroom, both of which were part of the graphic arts classroom.
 
 
 5
 Plaintiff, D.R., avers that the student defendants grabbed her and either forced or carried her into the bathroom or darkroom on a regular basis and physically abused her. She asserts that such conduct took place on an average of two to four times per week from January to May of 1990. Plaintiff, L.H., claims that some of the student defendants molested her two to three times per week from December 1989 to May of 1990. Plaintiffs allege that the sexual molestation consisted of offensive touching of their breasts and genitalia, sodomization and forced acts of fellatio. The student defendants also allegedly forced plaintiffs to watch similar acts performed on other students.
 
 
 6
 Defendant Susan Peters was the student teacher in the graphic arts classroom during the time of the alleged conduct in question. Plaintiffs do not claim to have informed Peters of the molestation but assert that Peters was or should have been in the classroom during the time of the acts complained of and either heard or should have heard the incidents taking place. Peters admittedly experienced difficulty in controlling the class generally. She allegedly was exposed to a variety of misconduct by the student defendants including obscene language and gestures, and physically, but not sexually, offensive touching of females including herself in the main classroom.
 
 
 7
 Plaintiff, L.H., avers that in December of 1988, she told defendant Bazzel, Assistant Director of Middle Bucks, that one student defendant was trying to force her into the bathroom for the purpose of engaging in sexual conduct. She alleges that Bazzel did not take action to correct the situation. Plaintiffs also allege that other individual school defendants had knowledge of the severe non-sexual misconduct occurring in the classroom.
 
 
 8
 Based on the foregoing allegations, the amended complaints assert violations of plaintiffs' civil rights by the school and student defendants under 42 U.S.C. §§ 1983 and 1985(3) as well as Pennsylvania law.
 
 II. DISTRICT COURT RULING
 
 9
 On the basis of the record before it, the district court found that defendants Goode, Peters, and Bazzel were entitled to qualified immunity under § 1983. D.R., L.R. and L.R. v. Middle Bucks Area Vocational Technical School, No. 90-03018 and 90-03060, 1991 WL 14082 at * 9-10, 1991 U.S.Dist. LEXIS 1292 at * 17-18 (E.D.Pa. Feb. 1, 1991). Rather than dismissing on that basis as to those defendants, however, the district court granted defendants' motions[6] to dismiss both complaints under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.
 
 
 10
 The district court first held that a special custodial relationship between plaintiffs and the school defendants was established by virtue of the state's compulsory attendance and truancy laws, Pa.Stat.Ann. tit. 24 §§ 13-1326-13-1330, 13-1333 and 13-1343 (1962 & Supp.1991), thus creating an affirmative constitutional duty on the part of the school defendants to protect plaintiffs from the types of acts committed by the student defendants. D.R., L.R. and L.R., 1991 WL 14082 at * 6, 1991 U.S.Dist. LEXIS 1292 at The court found that the existence of the affirmative duty to act was complemented by Pennsylvania law which gives school officials in loco parentis standing to take any action necessary to prevent disciplinary infractions and educationally disruptive behavior. Pa.Stat.Ann. tit. 24 § 13-1317 (1962 & Supp.1991). Nevertheless, the court concluded that the amended complaints failed to allege sufficient knowledge of the student misconduct on the part of the school defendants to charge them with the requisite reckless indifference to plaintiffs' rights to support a § 1983 claim and, therefore, dismissed the complaints.
 
 III. DISCUSSION
 
 11
 Plaintiffs' amended complaints allege that the school defendants had knowledge of the physical, verbal and sexual abuse committed by the student defendants and maintained a policy of laxity toward such conduct. They assert that the district court impermissibly narrowed their allegations by focusing solely on the issue of the school defendants' awareness of the sexual misconduct. Thus, as a consequence, they argue that the district court erred in granting the Rule 12(b)(6) motions, given the more expansive allegations and theories presented in their amended complaints.
 
 
 12
 The school defendants respond that the district court's dismissal can be affirmed by this court without reaching the issue of the sufficiency of the factual allegations as to their knowledge of the conduct of the student defendants. They assert that, contrary to the district court's ruling, no special relationship of constitutional proportions existed between plaintiffs and the school defendants. Thus, they say that this § 1983 action is not maintainable. We turn to that important and complex issue in this most wrenching factual setting.
 
 A. Standard of Review
 
 13
 This court's scope of review of the district court's dismissal for failure to state a claim is plenary. Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir.1990). We are required to "accept as true the facts alleged in the amended complaints and all reasonable inferences that can be drawn therefrom." Id. Construing the pleadings in favor of plaintiffs then, we must "determine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." Colburn v. Upper Darby Township, 838 F.2d 663, 665-66 (3d Cir.1988), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989).
 
 
 14
 B. Legal Sufficiency of the Complaints under § 1983
 
 
 15
 Generally, the first issue in a § 1983 case is whether a plaintiff sufficiently alleges a deprivation of any right secured by the constitution. Baker v. McCollan, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979). When a defendant asserts the affirmative defense of qualified immunity, however, the court must determine as a threshold matter whether the defendant is entitled to that defense. See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Thus, we must begin by addressing the immunity defense[7] asserted by defendants Goode, Peters and Bazzel.[8]
 
 
 16
 Officials exercising discretionary powers are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. The Supreme Court in Siegert v. Gilley, --- U.S. ----, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), recently clarified the analytical framework to be used to evaluate whether a plaintiff's allegations overcome the defense of qualified immunity. The Court there said that, "[a] necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." Id. at ----, 111 S.Ct. at 1793 (emphasis added). Thus, the predicate question for Goode, Peters and Bazzel is the same as that posed with respect to the other school defendants, namely, whether plaintiffs allege the "deprivation of any right secured by the constitution." Baker, 443 U.S. at 140, 99 S.Ct. at 2692. We will, therefore, consider plaintiffs' allegations of constitutional error as they relate to all of the school defendants.[9]
 
 
 17
 Plaintiffs state that they have a liberty interest in their personal bodily integrity protected by the Fourteenth Amendment as recognized in Ingraham v. Wright, 430 U.S. 651, 673-74, 97 S.Ct. 1401, 1413-14, 51 L.Ed.2d 711 (1977), and Youngberg v. Romeo, 457 U.S. 307, 315, 102 S.Ct. 2452, 2457, 73 L.Ed.2d 28 (1982). Defendants do not argue otherwise. In order to demonstrate a violation of their constitutional rights plaintiffs' amended complaints essentially assert four theories of liability. The first is based upon the finding of the existence of a special relationship between plaintiffs and the school defendants during the school day. Such relationship, they assert, gave rise to an affirmative constitutional duty on the part of state officials to protect students such as these plaintiffs from serious harm. Second, plaintiffs contend that the school defendants are liable for creating a danger that resulted in a violation of plaintiffs' constitutional rights under the Fourteenth Amendment. Third, they assert that the school defendants are responsible for the existence of a policy, custom or practice that permitted injuries to the plaintiffs in violation of their constitutional rights. Fourth, plaintiffs assert that defendants conspired to deprive them of certain constitutional rights. We will deal with each theory in turn.
 
 IV. CONSTITUTIONAL CLAIMS
 A. Special Relationship Custody
 
 18
 We commence our analysis by reiterating the well-established principle that the Due Process Clause does not impose an affirmative duty upon the state to protect its citizens. Rather, it serves as a limitation on the state's power to act. DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 195, 109 S.Ct. 998, 1002, 103 L.Ed.2d 249 (1989); Fialkowski v. Greenwich Home for Children, Inc., 921 F.2d 459, 465 (3d Cir.1990). However, when the state enters into a special relationship with a particular citizen, it may be held liable for failing to protect him or her from the private actions of third parties. Cornelius v. Town of Highland Lake, Ala., 880 F.2d 348, 352 (11th Cir.1989). This liability attaches under § 1983 when the state fails, under sufficiently culpable circumstances, to protect the health and safety of the citizen to whom it owes an affirmative duty. See Cornelius, 880 F.2d at 353.
 
 
 19
 We must decide at the outset whether the school defendants had such a special relationship with the plaintiffs during school hours that they owed plaintiffs a constitutional duty to protect them from the misconduct of the student defendants. Plaintiffs argue that one way the state can enter into a duty-producing relationship under this theory is by restraining a citizen's freedom to act on his or her own behalf. In addressing this argument, we turn to one of the seminal Supreme Court cases shedding light on § 1983 liability in this area.
 
 
 20
 In DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Court declined to impose a constitutional duty upon a state to protect the life, liberty or property of a citizen from deprivations by private actors absent the existence of a special relationship. DeShaney involved the state's repeated receipt of reports of abuse of a minor by his father. Notwithstanding the notice provided by the reports to the state agency, it did not remove the child from his father's custody.[10] The father subsequently beat the child resulting in permanent brain damage. The child and his mother filed a § 1983 action against state officials claiming that they deprived the minor of his liberty in violation of the Fourteenth Amendment "by failing to protect him against a risk of violence at his father's hands of which they knew or should have known." DeShaney, 489 U.S. at 193, 109 S.Ct. at 1002.
 
 
 21
 After stating the general rule that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," id. at 197, 109 S.Ct. at 1004, the Court went on to acknowledge that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." DeShaney at 198, 109 S.Ct. at 1004-05. The Court noted that it first recognized such an exception in Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Court in Estelle held that the state had an affirmative duty to provide adequate medical care for prisoners since incarceration prevents an inmate from caring for himself. Id. at 103-04, 97 S.Ct. at 290-91.
 
 
 22
 The Court extended the Estelle exception from the Eighth Amendment context to a Fourteenth Amendment substantive due process claim in Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). According to the DeShaney court, it there held that the Constitution imposed a duty upon the state to provide involuntarily committed mental patients "such services as are necessary to ensure their 'reasonable safety' from themselves and others." DeShaney, 489 U.S. at 199, 109 S.Ct. at 1005. The Court also pointed out in DeShaney, without editorial comment, that several appellate courts had analogized foster children to individuals who fall within the Estelle and Youngberg exceptions. Id. at 201 n. 9, 109 S.Ct. at 1006 n. 9. These courts imposed liability on the state for failing to protect children that the state placed in the care of foster parents when such placement resulted in abuse.
 
 
 23
 In commenting on each situation constituting a departure from the general rule, the Court noted:
 
 
 24
 [I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf-- through incarceration, institutionalization, or other similar restraint of personal liberty--which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.
 
 
 25
 DeShaney, 489 U.S. at 200, 109 S.Ct. at 1006 (emphasis added). Focusing primarily on physical restraint, the Court concluded that the Estelle- Youngberg exception was inapplicable to Joshua DeShaney's case since the conduct did not occur while the child was in the state's custody.
 
 
 26
 Although the Court decided that Joshua's situation did not amount to state custody, it left open the possibility that the duty owed by a state to prisoners and the institutionalized might also be owed to other categories of persons in custody by means of "similar restraints of personal liberty." Id. at 200, 109 S.Ct. at 1006. Plaintiffs seek to bring themselves within the quoted language.
 
 
 27
 Plaintiffs assert that Pennsylvania's scheme of compulsory attendance and the school defendants' exercise of in loco parentis authority over their pupils so restrain school children's liberty that plaintiffs can be considered to have been in state "custody" during school hours for Fourteenth Amendment purposes. We consider this to be an open question in this circuit. See Stoneking v. Bradford Area School District, 882 F.2d 720, 724 (3d Cir.1989).
 
 
 28
 Pennsylvania law mandates that every child of "compulsory school age" attend a day school. Pa.Stat.Ann. tit. 24 § 13-1327. Both children and their parents may be penalized for the child's truancy. Pa.Stat.Ann. tit. 24 §§ 13-1333 and 13-1343. However, a child is only of compulsory school age "until the age of seventeen (17) years." Pa.Stat.Ann. tit. 24 § 13-1326 (emphasis added). At the time of the incidents alleged, D.R. was sixteen and L.H. was seventeen years old. Appendix at 336. Thus, Pennsylvania law only mandated D.R.'s attendance. To the extent that plaintiffs' argument is dependant upon the compulsion provided by section 13-1327, it is, therefore, only applicable to D.R.
 
 
 29
 In order to decide whether a special relationship of constitutional proportions exists between the school defendants and D.R. by virtue of the Pennsylvania statutes, we must consider the DeShaney Court's rationale for the Estelle- Youngberg exception. The Court explained its reasoning as follows:
 
 
 30
 [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs--e.g. food, clothing, shelter, medical care, and reasonable safety--it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.
 
 
 31
 DeShaney, 489 U.S. at 200, 109 S.Ct. at 1005-06. Thus, the question presented to us is whether compulsory attendance paired with the in loco parentis authority of the school defendants resulted in such an affirmative restraint of D.R.'s liberty by the state that she was left without reasonable means of self-protection and, indeed, whether the focus should be confined to the school day.
 
 
 32
 Our court has read DeShaney primarily as setting out a test of physical custody. Philadelphia Police & Fire Ass'n for Handicapped Children, Inc. v. City of Philadelphia, 874 F.2d 156, 167 (3d Cir.1989) ("the state continues to owe an affirmative duty to protect those physically in its custody"). See also, Fialkowski v. Greenwich Home for Children, Inc., 921 F.2d 459 (3d Cir.1990) (deciding no Youngberg duty of care exists for mentally retarded adult voluntarily placed at institution because state has not substantially curtailed his freedom). The issue in Philadelphia Police was whether the state could be held liable for withdrawing vocational and support services provided in a daily program for mentally handicapped children. While admitting that cessation of services would be detrimental to the children, this court refused to expand the Estelle- Youngberg custody exception to these children since it was "impossible to find an affirmative duty to protect the mentally retarded living at home." Id. at 168. In essence, the court did not "believe that such intermittent custody gives rise to an affirmative duty on the state's part." Id. at 168 n. 9.
 
 
 33
 D.R. argues that, unlike the plaintiffs in Philadelphia Police who chose to receive state services, or plaintiff's decedent in Fialkowski who was voluntarily placed at the state institution, she was legally compelled to attend school and was placed under the control of state actors who were given parental authority over her as a matter of law. She therefore contends that she was in the state's custody during school hours within the rationale of the Estelle- Youngberg exception. She relies on the Supreme Court's explanation that Estelle and Youngberg together stand "for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." DeShaney, 489 U.S. at 199-200, 109 S.Ct. at 1005.
 
 
 34
 The Estelle- Youngberg type custody referred to by the Court in DeShaney, however, is to be sharply contrasted with D.R.'s situation. The state's duty to prisoners and involuntarily committed patients exists because of the full time severe and continuous state restriction of liberty in both environments. Institutionalized persons are wholly dependant upon the state for food, shelter, clothing and safety. It is not within their power to provide for themselves, nor are they given the opportunity to seek outside help to meet their basic needs. Obviously, they are not free to leave.
 
 
 35
 Here it is the parents who decide whether that education will take place in the home, in public or private schools or, as here, in a vocational-technical school. Id. For some, the options may be limited for financial reasons. However, even when enrolled in public school parents retain the discretion to remove the child from classes as they see fit, see Pa.Stat.Ann. tit. 24 § 15-1546 (1962 & Supp.1991) (religious instruction); 22 Pa.Code § 11.26 (1992) (non-school sponsored educational trips and tours); Pa.Stat.Ann. tit. 24 § 13-1329 (1962) (healthcare), subject only to truancy penalties for continued periods of unexcused absence. Pa.Stat.Ann. tit. 24 §§ 13-1333 and 13-1343. In the case of special education students, the parents have even greater involvement since they must approve the precise educational program developed for their child. 20 U.S.C. § 1415 (1988); 22 Pa.Code §§ 14.32, 14.61-68 (1992). Moreover, as the Pennsylvania Supreme Court has recognized, even without reference to the Pennsylvania School Code or related statutes, "it [cannot] be denied that a parent is justified in withdrawing his child from a school where the health and welfare of the child is threatened." Zebra v. School District of City of Pittsburgh, 449 Pa. 432, 296 A.2d 748 (1972).
 
 
 36
 Our view that parents remain the primary caretakers, despite their presence in school, is not affected by section 13-1317 which grants Pennsylvania teachers and principals in loco parentis status. Section 13-1317 operates in conjunction with section 5-510. Together they permit school boards to set reasonable regulations to govern students' conduct. Pa.Stat.Ann. tit. 24 § 5-510 (1962 & Supp.1991). However, section 13-1317 invests in school officials "only such control as is reasonably necessary to prevent infractions of discipline and interference with the educational process." Axtell v. Lapenna, 323 F.Supp. 1077 (W.D.Pa.1971). As the Commonwealth court concluded, section 13-1317 "invests authority in public school teachers; it does not impose a duty upon them." Pennsylvania State Education Association v. Department of Public Welfare, 68 Pa.Comm. 279, 449 A.2d 89, 92 (1982) (emphasis in original) (holding that teachers are not among those persons "responsible" for a child's welfare under § 2203 of the Child Protective Services Law, Pa.Stat.Ann. tit. 11 §§ 2201-2224 (1962), now codified at 23 P.C.S.A. § 6311 (1991)).
 
 
 37
 By requiring D.R. to attend assigned classes at Middle Bucks as part of her high school educational program, and authorizing officials to engage in disciplinary control over the students, the school defendants did not restrict D.R.'s freedom to the extent that she was prevented from meeting her basic needs. See Fialkowski, 921 F.2d at 465-66 (mentally retarded adult's liberty not restrained by state where "the Fialkowskis were free to remove their son from [the state institution] if they wished [and] Walter Fialkowski himself enjoyed considerable freedom of movement.") Thus, the school defendants' authority over D.R. during the school day cannot be said to create the type of physical custody necessary to bring it within the special relationship noted in DeShaney, particularly when their channels for outside communication were not totally closed.
 
 
 38
 The analogy between school children and prisoners or the involuntarily committed is weakened further by the fact that school children remain resident in their homes. Thus, they may turn to persons unrelated to the state for help on a daily basis. D.R.'s complaint alleges an ongoing series of assaults and abuse over a period of months. Although these acts allegedly took place during the school day, D.R. could, and did, leave the school building every day. The state did nothing to restrict her liberty after school hours and thus did not deny her meaningful access to sources of help.
 
 
 39
 As noted previously, some courts have imposed a constitutional duty to protect foster children by analogy to involuntarily institutionalized individuals. See, Doe v. New York City Dept. of Social Services, 649 F.2d 134 (1981), after remand, 709 F.2d 782 (2d Cir.), cert. denied sub nom., Catholic Home Bureau v. Doe, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); Taylor By and Through Walker v. Ledbetter, 818 F.2d 791 (11th Cir.1987), cert. denied, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989). We, of course, are not called upon to decide the foster care issue. Nevertheless, we do note that although the situation of a public school student is perhaps closer to that of a foster child than to an institutionalized person, the foster care analogy is not decisive.
 
 
 40
 A relationship between the state and foster children arises out of the state's affirmative act in finding the children and placing them with state-approved families. Taylor, 818 F.2d at 794-97. By so doing, the state assumes an important continuing, if not immediate, responsibility for the child's well-being. In addition, the child's placement renders him or her dependent upon the state, through the foster family, to meet the child's basic needs. Id. Students, on the other hand, do not depend upon the schools to provide for their basic human needs. Public school students are required to spend only 180 six-hour days in the classroom per year. Pa.Stat.Ann., tit. 24 §§ 13-1327(b), 15-1501, 15-1504(a) (1962 & Supp.1991). Even during the school day, however, parents or others remain a child's primary caretakers and decisionmakers. See e.g., Pa.Stat.Ann., tit. 24 § 14-1406 (1962) (parents responsible for necessary medical treatment). Pennsylvania's compulsory attendance law demands only that parents ensure that their child receive an appropriate education. Pa.Stat.Ann. tit. 24 § 13-1327. Thus, the relationship between foster children and public school students is not controlling here.
 
 
 41
 Our view of the public school function with respect to its students seems to be in harmony with the Supreme Court's description of that institution in the context of denying school children Eighth Amendment protection from corporal punishment. There the Court said:
 
 
 42
 The school child has little need for the protection of the Eighth Amendment. Though attendance may not always be voluntary, the public school remains an open institution. Except perhaps when very young, the child is not physically restrained from leaving school during school hours; and at the end of the school day, the child is invariably free to return home. Even while at school, the child brings with him the support of family and friends and is rarely apart from teachers and other pupils who may witness and protest any instances of mistreatment.
 
 
 43
 Ingraham, 430 U.S. at 670, 97 S.Ct. at 1412.
 
 
 44
 Our position that no special relationship based upon a restraint of liberty exists here is in accord with the only other appellate case to directly confront this issue to date. In J.O. v. Alton Community Unit School Dist. 11, 909 F.2d 267 (7th Cir.1990), the Court of Appeals for the Seventh Circuit found that compulsory attendance laws did not liken school children to prisoners and the involuntarily committed, both of whom are unable to provide for their own basic human needs. Instead, the Seventh Circuit determined that parents have primary responsibility to provide for the basic needs of their children and that both school children and parents "retain substantial freedom to act." Id. at 272.
 
 B. State Created Danger
 
 45
 We come to plaintiffs' second basis for their constitutional claim, viz., that the school defendants created the danger that eventuated in a violation of plaintiffs' constitutional rights. Plaintiffs' counsel asserts that this claim exists apart from the claim based on the compulsory attendance law and applies to both plaintiffs. We now address that claim.
 
 
 46
 We understand plaintiffs' amended complaints, their briefs and the oral assertions of their counsel to advance a claim that the school defendants imperiled plaintiffs, or increased their risks of harm, by: (1) failing to report to the parents or other authorities the misconduct resulting in abuse to plaintiffs; (2) placing the class under the control of an inadequately trained and supervised student teacher; (3) failing to demand proper conduct of the student defendants; and (4) failing to investigate and put a stop to the physical and sexual misconduct. Plaintiffs say that these acts or omissions "created a climate which facilitated sexual and physical abuse of students." L.H.'s Amended Complaint, App. at 58. Thus, they assert that having placed plaintiffs in the situation alleged, the school defendants were obligated to protect them from violations of their personal bodily integrity by other students who were also under such defendants' control.
 
 
 47
 The state-created danger theory, utilized to find a constitutional tort duty under § 1983 outside of a strictly custodial context, has been recognized by several courts of appeals.[11] Cornelius v. Town of Highland Lake, 880 F.2d 348 (11th Cir.1989); Wood v. Ostrander, 879 F.2d 583 (9th Cir.1989), cert. denied, --- U.S. ----, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990); Jackson v. City of Joliet, 715 F.2d 1200, 1204 (7th Cir.1983). After determining in DeShaney that there was no Estelle- Youngberg type custody there giving rise to an affirmative duty of protection, the Court commented that "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them." DeShaney, 489 U.S. at 201, 109 S.Ct. at 1006 (emphasis added).
 
 
 48
 Post-DeShaney courts have tracked the quoted Supreme Court's language by asking whether the state actors involved affirmatively acted to create plaintiff's danger, or to render him or her more vulnerable to it. See e.g., Bryson v. City of Edmond, 905 F.2d 1386, 1392 (10th Cir.1990) (declining to impose liability upon state for deaths of post office employees shot by fellow worker where responding police did not create the dangerous situation nor act to worsen decedents' plights). We turn to Third Circuit case law in this area.
 
 
 49
 In Brown v. Grabowski, 922 F.2d 1097 (3d Cir.1990), this court considered the state-created danger theory as enunciated in Wood and Cornelius. There, the plaintiff's decedent reported to the police that her former boyfriend had held her hostage, threatened her, and sexually assaulted her for three days. The police did not place her abductor under arrest, and failed to inform her of her right to request a temporary restraining order under New Jersey's Prevention of Domestic Violence Act. N.J.Stat.Ann. § 2C:25-7 (1982). She was subsequently found dead in the trunk of her abductor's car. This court distinguished the state officials' actions in Brown from those in Wood and Cornelius where the courts found affirmative constitutional duties of protection. Brown, 922 F.2d at 1114-17. Ultimately, the court concluded that, "[i]n contrast to the plaintiff in Wood, [plaintiff] has supplied no evidence that [the state actors] acted to create or to exacerbate the danger that [the abductor] posed to [her], thereby triggering a possible constitutional duty to assist her in gaining access to the civil courts." Id. at 1116.
 
 
 50
 Plaintiffs here also rely upon Wood and Cornelius to demonstrate the use of the state-created danger theory to impose liability under § 1983. In addition, they cite Swader v. Virginia, 743 F.Supp. 434 (E.D.Va.1990), Horton v. Flenory, 889 F.2d 454 (3d Cir.1989), and Germany v. Vance, 868 F.2d 9 (1st Cir.1989). As in Brown, however, the facts alleged in plaintiffs' amended complaints differ in important respects from those in the state-created danger line of cases.
 
 
 51
 Liability under the state-created danger theory is predicated upon the states' affirmative acts which work to plaintiffs' detriments in terms of exposure to danger. As the Court of Appeals for the First Circuit commented:
 
 
 52
 We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.
 
 
 53
 Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir.1982). Although we find this to be an extremely close case, and certainly a tragedy, we are convinced that the school defendants did not create plaintiffs' peril, increase their risks of harm, or act to render them more vulnerable to the student defendants' assaults.
 
 
 54
 In Wood, the police officer arrested an intoxicated driver and impounded the vehicle leaving the driver's female passenger in a neighborhood known for criminal activity at night without any means to travel to a place of safety. The woman was raped by a stranger who offered to take her home. In Cornelius, the state prison officials and local officers instituted a prisoner work program which permitted inmates to work in public areas with access to dangerous weapons under the general supervision of an untrained city employee. Although the authorities represented to the public that only property offenders would be assigned to the work crews, the state permitted a prisoner with a violent criminal history to work in the town hall where plaintiff was employed. This prisoner abducted plaintiff at knife-point and held her hostage for three days, subjecting her to repeated threats of physical and sexual abuse. Finally, in Swader, officials permitted a prisoner serving a life sentence for rape to work unsupervised outside the prison gates, but still on prison property. This prisoner raped and killed the daughter of a prison employee who was required by her employment to reside on the complex grounds.
 
 
 55
 In each of these cited cases, the state can fairly be said to have affirmatively acted to create the danger to the victims. The school defendants' "acts" in assigning student teacher Peters to the graphic acts class and failing to supervise her more closely, as well as their failure to put a stop to the non-sexual pandemonium may have created a recognizable risk that plaintiffs would receive little education in that class, and perhaps, physical injury due to the roughhousing. Plaintiffs did not suffer harm, however, from that kind of foreseeable risk. See Williamson v. City of Virginia Beach, Va., 786 F.Supp. 1238, 1253 (E.D.Va.1992) (no § 1983 liability for minor informant's suicide due to stress of receiving threats where recognized risk is retaliation against the informant or his family). Plaintiffs' harm came about solely through the acts of private persons without the level of intermingling of state conduct with private violence that supported liability in Wood, Swader and Cornelius.
 
 
 56
 We now turn to the final two cases cited by plaintiffs to support their theory of state-created danger. In Horton, the owner of a private club, a retired police officer known for his violence, believed an employee to be responsible for the burglarization of the club. He interrogated the employee and summoned the police. Sergeant Dlubak, who responded to the call, also questioned the employee, but refused to remove him from the owner's premises notwithstanding signs of physical mistreatment. This court imposed liability upon the state holding that "[c]learly, Sgt. Dlubak was a participant in the custody which led to the victim's death." Id. at 458.
 
 
 57
 In Germany, plaintiff, a minor, was committed to the custody of the state based upon a charge of assault and battery upon her father. The court held the state liable under § 1983 for its failure to reveal an admission obtained after the delinquency proceedings that plaintiff's parents had fabricated the assault charge to obtain state services for their daughter. The state's failure to disclose the information resulted in continued state "custody" via foster homes and other placements, after the grounds for the delinquency charges had dissipated.
 
 
 58
 We believe that plaintiffs' reliance on Horton and Germany to support their theory of state-created danger is misplaced since we read both cases to turn upon a finding of "functional" custody. Moreover, the school defendants here, unlike the state officials in Horton and Germany, are not alleged to have encouraged or implicitly authorized the violations by bestowing on the student defendants any authority under color of law. In both cited cases, the states' acts in withholding vital information served to increase the risks of harm by permitting continued custody with the states' imprimatur.
 
 
 59
 Plaintiffs also allege that the "acts of the School Defendants ... in setting up the graphic arts classroom, and the unisex bathroom, demonstrates a custom, policy or practice of ... indifference to and the failure to protect [plaintiffs'] rights." L.H.'s Amended Complaint, App. at 263 (emphasis added). The allegation seems to be made to support a contention that the state created or increased plaintiffs' danger.
 
 
 60
 We do not believe, however, that the state can be said to have created or increased plaintiffs' risk of danger by constructing and maintaining the graphic arts classroom with its particular physical layout. Bathrooms generally are equipped with inside locks for privacy purposes and obviously, the room was not intended to be used by both sexes at the same time. The same conduct could have occurred had the school built separate bathrooms for its male and female students. As for the darkroom, it must by definition be closed off from the main classroom in order to serve its function. The existence of the darkroom and of a single restroom, both contained within the high school classroom, did not subject plaintiffs to an inherently dangerous environment. Compare White v. Rochford, 592 F.2d 381, 384-85 (7th Cir.1979) (children left in car on side of busy highway after state officer arrested the driver).
 
 
 61
 Plaintiffs also argue that school defendants increased their risks of harm by failing to report the abuse to plaintiffs' parents or other authorities. This argument stems in part from their assertion that defendants are under a state imposed duty to report abuse pursuant to 23 P.C.S.A. §§ 6311 and 6312 (1991). It is clear, however, that a violation of a state law duty, by itself, is insufficient to state a § 1983 claim. Brown, 922 F.2d at 1113 (citing Maine v. Thiboutot, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980)). Section 1983 liability arises only from a violation of federal statutory or constitutional rights under color of state law. Id.; see also, Youngberg, 457 U.S. at 330, 102 S.Ct. at 2465 (Burger, J., concurring). Thus, " '[i]llegality under the state statute can neither add to nor subtract from [the] constitutional validity [of a state's actions].' " Archie v. City of Racine, 847 F.2d 1211, 1216 (7th Cir.1988) (quoting Snowden v. Hughes, 321 U.S. 1, 11, 64 S.Ct. 397, 402, 88 L.Ed. 497 (1944)).[12]
 
 
 62
 We readily acknowledge the apparent indefensible passivity of at least some school defendants under the circumstances. Accepting the allegations as true, viz., that one school defendant was advised of the misconduct and apparently did not investigate, they show nonfeasance but they do not rise to the level of a constitutional violation. As in DeShaney, "[t]he most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." DeShaney, 489 U.S. at 203, 109 S.Ct. at 1007; see also, Brown, 922 F.2d at 1116 (Defendant "could and should have instructed [plaintiff] as to her rights under the [Prevention of Domestic Violence] Act. He was not, however, constitutionally compelled to do so.")
 
 
 63
 In sum, plaintiffs' allegations are insufficient to show, as required under DeShaney, that the school defendants either impermissibly limited the freedom of the plaintiffs to act on their own behalf, or barred their access to outside support. Nor do they demonstrate that defendants violated a constitutional duty by creating or exacerbating the danger posed by the student defendants. See Brown, 922 F.2d at 1116. It is not our province to say what the state responsibility is or should be in situations like the present. We do say that the Fourteenth Amendment does not automatically embrace such conduct.
 
 
 64
 C. State Established Policy, Custom or Practice
 
 
 65
 We read plaintiffs' amended complaints to assert a third theory of constitutional liability that is viable even in the absence of a special relationship duty. Stoneking v. Bradford Area School District, 882 F.2d 720, 725 (3d Cir.1989), cert. denied, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990) ("Stoneking II" ). In Stoneking II, this court recognized that state defendants may be held liable for deliberately and recklessly establishing and maintaining a custom, practice or policy which caused harm to a student when a teacher sexually molested a student. We stated there that nothing in DeShaney "suggests that state officials may escape liability arising from their policies maintained in deliberate indifference to actions taken by their subordinates." Id. at 725. We emphasized that DeShaney was distinguishable because the abuse there "resulted at the hands of a private actor." Id. at 724.
 
 
 66
 We agree with the district court that this case lacks the linchpin of Stoneking II, namely, a violation by state actors. Sexual molestation committed by an agent of the state is readily distinguishable from the situation present here since the Due Process Clause itself imposes limitations on the state's conduct. Thus, § 1983 liability may not be predicated upon a Stoneking II type theory because private actors committed the underlying violative acts.
 
 
 67
 Since we have concluded that plaintiffs failed to assert a constitutional claim under § 1983, the district court correctly determined that defendants Goode, Peters and Bazzel were entitled to a dismissal based on qualified immunity. See, Siegert v. Gilley, --- U.S. ----, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). It also properly dismissed the § 1983 claims against the other school defendants for failure to assert a federal claim.
 
 
 68
 D. Conspiracy to Deprive Plaintiffs of Constitutional Rights
 
 
 69
 Plaintiffs also charge that defendants engaged in a conspiracy to interfere with their civil rights in violation of 42 U.S.C. § 1985(3). In order to prevail, plaintiffs must show a conspiracy on the part of the school defendants to deprive them of equal protection or equal privileges and immunities motivated by "class-based, invidiously discriminatory customs and practices of failing to protect female students from sexual, physical and verbal abuse." Specifically, the amended complaints assert that the school defendants' acts in setting up the graphics arts classroom to include a darkroom and unisex bathroom constituted a deliberate and reckless indifference to female students' rights.
 
 
 70
 We agree with the district court that plaintiffs failed to assert any facts from which any type of conspiratorial agreement between the school defendants and the student defendants can be inferred. Neither do the pleadings establish that the alleged discriminatory policies or practices were due to plaintiffs' membership in the class of female students. "[M]ere conclusory allegations of deprivations of constitutional rights," Robinson v. McCorkle, 462 F.2d 111, 113 (3d Cir.), cert. denied, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 492 (1972), are insufficient to state a § 1985(3) claim. Id.
 
 VI. CONCLUSION
 
 71
 No one could help but be shocked by the factual allegations in this case. But in DeShaney the Supreme Court rejected the "shock the conscience" test of Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), as a standard for imposing § 1983 liability. To do otherwise would readily convert much tortious conduct into constitutional violations at the expense of a decent regard for federalism. While the line is certainly blurred, we are not prepared to say that the conduct charged to the school defendants here crossed the line.[13]
 
 
 72
 In view of our affirmance of the district court's dismissal of the constitutional claims, we will also affirm the dismissal of the pendent state law claims.
 
 
 73
 The order of the district court will be affirmed.
 
 
 74
 SLOVITER, Chief Judge, dissenting, with whom MANSMANN, SCIRICA and NYGAARD, Circuit Judges, join.
 
 
 75
 The majority opinion is based on the premise that the types of relationships which can give rise to a constitutional duty of a state to protect its school children from harm from third parties is mandated by the Supreme Court's opinion in DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). I believe that is too narrow a reading of DeShaney, and that the scope of the Due Process Clause's duty to protect, while limited, extends beyond the narrow compass of those persons involuntarily committed to prisons and mental institutions.
 
 
 76
 The majority reads this court's prior opinions as limiting the applicability of such a duty to situations in which the state has total and continuous custody of the individuals. I believe that our cases do not enunciate such a principle, that those cases arose out of fact patterns markedly different from the one presented here involving school children compelled to attend school on a regular basis, and that, in any event, as panel opinions they are not binding on this court when sitting in banc.
 
 
 77
 I believe that we are free to decide, as I would hold, that the state compulsion that students attend school, the status of most students as minors whose judgment is not fully mature, the discretion extended by the state to schools to control student behavior, and the pervasive control exercised by the schools over their students during the period of time they are in school, combine to create the type of special relationship which imposes a constitutional duty on the schools to protect the liberty interests of students while they are in the state's functional custody.I.
 
 
 78
 The majority does not address the question whether the plaintiffs adequately asserted a claim under the standards of culpability applicable to claims under 42 U.S.C. § 1983. That was the basis upon which the district court dismissed the complaint. Because I disagree with the majority's disposition of this case, I cannot avoid that issue and would hold that the complaint alleges a claim sufficient to withstand dismissal under Fed.R.Civ.P. 12(b)(6).
 
 
 79
 There is no question that D.R. has a liberty interest in "safety and freedom from bodily restraint." Youngberg v. Romeo, 457 U.S. 307, 319, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28 (1982). Focusing primarily on D.R., as the majority does, if the allegations in her complaint are true, she was subject to violent, sexual assault two to four times a week over a five-month period while attending school. App. at 225-26. D.R. alleges, inter alia, that the conduct included
 
 
 80
 (a) Touching by the Perpetrator Defendants, and each of them, of the genital parts of minor Plaintiff;
 
 
 81
 (b) Touching the breasts of minor Plaintiff;
 
 
 82
 (c) Forcing and causing minor Plaintiff to masturbate the Perpetrator Defendants, and each of them;
 
 
 83
 (d) Causing and forcing minor Plaintiff to commit fellatio on the Perpetrator Defendants, and each of them;
 
 
 84
 (e) The commission of acts of sodomy on minor Plaintiff;
 
 
 85
 (f) Causing and forcing minor Plaintiff to watch and observe the Perpetrator Defendants, and each of them, perform similar offensive sex acts on one or more other female students in the graphics occupations classes;
 
 
 86
 (g) Causing and forcing minor Plaintiff to watch and observe the Perpetrator Defendants have offensive physical contact--apparently non-sexual--with one or more of the school teachers including, but not limited to, Defendant Peters.
 
 
 87
 App. at 225.
 
 
 88
 These allegations belie the majority's characterization of the conduct as "non-sexual pandemonium," Maj. op. at 1374, and its conclusion that harm from sexual assault was not a foreseeable risk. The most extreme sexual misconduct allegedly went on in a lavatory with an inside lock, designated as a unisex facility by school officials, that was part of the graphic arts classroom. D.R. alleges that the student teacher put in charge of that classroom, Susan Peters, witnessed daily the chaotic behavior that took place in her classroom and was present when the male students grabbed at D.R., touched her breasts, pushed her down, and dragged her into the bathroom. App. at 222, 226-28. The teacher's general reaction was to ignore the behavior or walk away. App. at 229. On one occasion Peters made the students open the bathroom door when she knew a number of boys and girls were in there. App. at 228. Peters even commented once about " 'those boys and their raging hormones.' " App. at 229. Apparently a videotape of the class was made by a male student which showed "open lewdness" while the teacher was sitting at her desk watching. App. at 222-23, 739-41.[1] The other school officials also knew about the situation in the graphic arts classroom and did not try to remedy it. App. at 230-32.
 
 
 89
 Thus, the complaint sufficiently alleges deliberate and reckless indifference by school officials to the safety and physical well-being of the students while they were in the functional custody of the school. See Colburn v. Upper Darby Township, 838 F.2d 663, 669-70 (3d Cir.1988), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989). However, since the harm was inflicted by other students, rather than by a school official, cf. Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720 (3d Cir.1989) (Stoneking II ), cert. denied, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990), I agree with the majority that the question here is whether it can be fairly stated that the state deprived D.R. of her liberty interest in " 'freedom from ... unjustified intrusions on personal security.' " DeShaney, 489 U.S. at 195, 109 S.Ct. at 1003 (quoting Ingraham v. Wright, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977)). Phrased differently, the only issue before us is whether we can say, as a matter of law, taking all of the allegations of the complaint as true, that the limited duty to protect encompassed in the Due Process Clause is inapplicable to public school children.
 
 II.
 
 90
 In its holding in DeShaney that a minor who was returned by state agents to the custody of his father at whose hands he later suffered grievous harm could not maintain an action against the County and its agents, the Supreme Court emphasized that Joshua DeShaney suffered all of his injuries at the hands of and while in the custody of his father. The Court stated, "Petitioners concede that the harm Joshua suffered did not occur while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor." Id. at 201, 109 S.Ct. at 1006 (emphasis added). In this case, unlike DeShaney, the harm was inflicted while the victim was in the state's custody and/or care.
 
 
 91
 The majority emphasizes the Court's language referring to the "affirmative act of restraining the individual's freedom to act on his own behalf," id. at 200, 109 S.Ct. at 1006, as the crux of DeShaney. However, as the majority itself recognizes, the Supreme Court stated that a duty to protect can arise from "the State's affirmative act of restraining the individual's freedom to act on his own behalf--through incarceration, institutionalization, or other similar restraint of personal liberty...." Id. (emphasis added). The Court did not say "other similar types of custody," which it could easily have done if it had so meant. Involuntary custody is just one type of "limitation which [the State can] impose[ ] on [an individual's] freedom to act on his own behalf." Id.[2]
 
 
 92
 DeShaney contains no language to support the majority's holding that the duty to protect can be triggered only by involuntary, round-the-clock, legal custody. Nothing in the opinion suggests that compulsory school attendance cannot qualify as the type of state restraint of personal liberty which gives rise to a duty to protect. As this court has previously recognized, "DeShaney requires that the state have imposed some kind of limitation on a victim's ability to act in his own interests." Horton v. Flenory, 889 F.2d 454, 458 (3d Cir.1989). However, we continued, "[w]hile specifically referring to imprisonment and institutionalization ... the [DeShaney ] court acknowledges that other similar state-imposed restraints of personal liberty will trigger a state duty to prevent harm." Id. In fact, the DeShaney Court left open the possibility that the state might have a special relationship with a child it places in foster care, 489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9, even though it would no longer be the state that had the direct daily contact with the child.
 
 
 93
 Admittedly, in DeShaney the Court did focus upon the voluntariness vel non of the custody. See 489 U.S. at 200, 109 S.Ct. at 1006. Although a student is not held in school under shackles, there is substantial compulsion associated with schooling. Barring unusual circumstances, school attendance up until the age of seventeen is mandatory in the Commonwealth of Pennsylvania. Pa.Stat.Ann. tit. 24, §§ 13-1326 to 1327 (Purdon 1962 & Supp.1992); In re D.M., 19 Pa. D & C.3d 514, 520 (1981).[3]
 
 
 94
 The majority of secondary school students are minors, and the law recognizes that their judgment may not be fully mature and developed: children cannot vote, U.S. Const. amend. XXVI; they cannot serve in the armed forces, 10 U.S.C. § 505(a) (1988); if arrested, they are tried in juvenile courts, 42 Pa. Cons.Stat.Ann. §§ 6301, 6322 (Purdon 1982 & Supp.1992); and if pregnant, they must ask a parent for permission to have an abortion, 18 Pa. Cons.Stat.Ann. § 3206 (Purdon Supp.1992).
 
 
 95
 During the school day, school officials exercise substantial control over students, either because they are considered to stand in loco parentis toward the students, Pa.Stat.Ann. tit. 24, § 13-1317 (Purdon Supp.1992), or because proper discipline so requires. Ingraham v. Wright, 430 U.S. 651, 662, 97 S.Ct. 1401, 1408, 51 L.Ed.2d 711 (1977). These rationales are frequently invoked by school officials in an attempt to claim immunity for their actions, see New Jersey v. T.L.O., 469 U.S. 325, 336-37, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985) (rejecting state's defense on ground that in loco parentis authority does not excuse school authorities from limits of Fourth Amendment), and also have been relied upon by the Supreme Court to recognize the special relationship between school officials and the students they supervise. Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 684, 106 S.Ct. 3159, 3165, 92 L.Ed.2d 549 (1986) (recognizing "the obvious concern on the part of ... school authorities acting in loco parentis, to protect children ... from exposure to sexually explicit, indecent, or lewd speech").
 
 
 96
 In their capacity as "parents," school officials can exercise control over the movements of their students. In discussing the general acceptance of corporal punishment in public schools, Justice Powell, speaking for a majority of the Court, stated that "[t]he prevalent rule in this country today privileges such force as a teacher or administrator 'reasonably believes to be necessary for [the child's] proper control, training or education.' " Ingraham, 430 U.S. at 661, 97 S.Ct. at 1407 (quoting Restatement (Second) of Torts § 147(2) (1965)).
 
 
 97
 The majority minimizes the impact of compulsory education laws for reasons I find totally unpersuasive. The compulsory nature of public school attendance is not lessened by the fact that a few fortunate students have the option to attend private school or be educated at home. For the vast majority of children of school age, this is no choice at all. Their families are not in a financial position to fund a private school education.[4] Even fewer are in the rare position of being able to provide their children an adequate education at home.[5] Nor does the fact that parents may remove a child from school for specified reasons, such as religious instruction, or participate in planning the education of a special education student mean that the child is in the parents' custody, rather than in the school's custody, for the period that s/he is in school.
 
 
 98
 I find inexplicable the majority's conclusion on the record before us that "the school defendants did not restrict D.R.'s freedom to the extent that she was prevented from meeting her basic needs." Maj. op. at 1371-72. In the complaint, D.R. claims that in order to avoid the situation in the classroom lavatory, she repeatedly requested a pass to use a different lavatory. Peters either ignored her or refused. App. at 228. As a result, D.R. was obliged by the actions of the school itself to use the unisex lavatory. Nor could D.R. have simply walked out of school without permission during school hours without calling into play the truancy laws. See Pa.Stat.Ann., tit. 24, §§ 13-1333, 13-1343 (Purdon 1962 & Supp.1992). Moreover, counsel for Amicus Curiae, the Pennsylvania School Board Association, conceded in the argument before us that the school would not have permitted D.R.'s mother to attend school to provide assistance or a watchful eye over the chaotic classroom conditions.
 
 
 99
 It is the majority's thesis that students, unlike prisoners, have meaningful access to sources of help. See Maj. op. at 1372. Yet the reluctance of children to disclose sexual abuse is generally acknowledged. See Myers v. Morris, 810 F.2d 1437, 1459-60 (8th Cir.) (noting "unique reluctance" of children to disclose sexual abuse), cert. denied, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987); Doe v. New York City Dept. of Social Servs., 709 F.2d 782, 785 (2d Cir.) (doctor testified that great majority of abused children deny abuse), cert. denied, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). Elementary school age children are unlikely to be sufficiently independent of the school authorities to complain promptly to their parents about constitutional deprivations occurring at school, and even older students may be in comparable situations. There is, at least, a factual issue presented in this case as to whether D.R. was in a position effectively to seek help. D.R. qualified as an "exceptional student," see Maj. op. at 1366 n. 5, because she is "almost totally hearing impaired" and "[h]er powers of articulation are seriously limited." App. at 744.[6]
 
 
 100
 D.R. alleges that she was unable to disclose the assaults because of her disability and her fear. See App. at 232. In a poignant revelation of her vulnerability, D.R. stated that she was afraid that if she complained about the brutality to anyone and was removed from the classroom, she would have nowhere to go. App. at 232, 746. Presumably her fear arose from the fact that she had already been removed from a regular public school to go to this vocational school. The fact is that she suffered these indignities for many months before telling anyone.
 
 
 101
 Unless custody is limited to incarceration and involuntary institutionalization (and the DeShaney language suggests otherwise), the duty of state entities to protect those already within their charge should be broad enough to extend at least to young children and those who, because of disability or other impairment, are not likely to seek assistance promptly. In fact, prisoners are probably much more articulate about their complaints about mistreatment than are school children, particularly when the treatment consists, as in this case, of sexual abuse.
 
 
 102
 Moreover, in DeShaney the Court emphasized the relevance of the State's responsibility in placing the person in a position of danger. The Court stated,
 
 
 103
 Petitioners concede that the harm Joshua suffered did not occur while he was in the State's custody, but while he was in the custody of his natural father who was in no sense a state actor. While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect Joshua.
 
 
 104
 489 U.S. at 201, 109 S.Ct. at 1006 (footnote omitted) (emphasis added).
 
 
 105
 The DeShaney opinion is in line with Supreme Court cases that decline to impose upon state entities a constitutional duty to come to the aid of the vast general public. As the Court stated, the Due Process Clause does not "impose an affirmative obligation on the State to ensure that [the life, liberty and property of its citizens] do not come to harm through other means." Id. at 195, 109 S.Ct. at 1003 (emphasis added). Even knowledge that an identified victim, as distinguished from the public at large, faced a danger does not give rise to an affirmative duty. DeShaney, at 198 n. 4, 109 S.Ct. at 1004 n. 4; see Brown v. Grabowski, 922 F.2d 1097, 1113-16 (3d Cir.1990) (no constitutional liability for police who failed to come to aid of individual who had alerted police of potential danger at hands of prior assailant), cert. denied, --- U.S. ----, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991). Nor is there any liability on the state for unanticipated, albeit possibly foreseeable, harm caused by a furloughed prisoner. See Martinez v. California, 444 U.S. 277, 284-85, 100 S.Ct. 553, 558-59, 62 L.Ed.2d 481 (1980); Commonwealth Bank & Trust Co. v. Russell, 825 F.2d 12, 14-17 (3d Cir.1987). Such open-ended duties would impose upon the states almost infinite liability.
 
 
 106
 D.R. was in a vastly different situation because her injury did not come about exclusively through "other means." Unlike the state's claim in DeShaney with respect to the harm to Joshua, the School District cannot claim that it did not play some role in creating the danger to D.R. or making her "more vulnerable." Here, it was the school that designed the unisex lavatory in the classroom; it was the school that refused to allow D.R. to use another lavatory; it was the school that hired an inexperienced student teacher; and it was the school that tolerated the chaotic behavior and the sexual aggressiveness of the students. Therefore, we cannot reasonably conclude at this juncture of the case that the harm to D.R. came about by means apart from the state.
 
 III.
 
 107
 I am also not convinced that our own case law since DeShaney, even if binding, compels the result reached by the majority. To the contrary, as the majority opinion recognizes, whether school children are in state custody while attending public school has been an open question in this circuit. See Maj. op. at 1370; Stoneking II, 882 F.2d at 724; see also Horton, 889 F.2d at 458 (recognizing that although DeShaney specifically referred to imprisonment and institutionalization, "other similar state-imposed restraints of personal liberty will trigger a state duty to prevent harm").
 
 
 108
 It is clear that in Philadelphia Police & Fire Ass'n v. City of Philadelphia, 874 F.2d 156, 168 (3d Cir.1989), where we held that there was no affirmative state duty to provide services to the mentally retarded who were living at home, the withdrawal of the state's services affected persons who were not at that time within any form of state custody, functional or legal. Thus our statement that "the state continues to owe an affirmative duty to protect those physically in its custody," id. at 167, did not imply that total legal custody is the only situation giving rise to an affirmative duty. Similarly, our statement, quoted by the majority, that we did not believe that "intermittent custody gives rise to an affirmative duty on the state's part," id. at n. 9, referred to the affirmative duty to provide services to the mentally retarded living at home, not to the state's affirmative duty of protection when it actually had functional custody.
 
 
 109
 Also relied upon by the majority is Fialkowski v. Greenwich Home for Children, Inc., 921 F.2d 459 (3d Cir.1990). In that case a mentally retarded individual voluntarily residing in a community living arrangement (CLA) to which he was referred by defendant choked to death while eating. Damages were sought under section 1983 from the base mental health service unit (Northeast) which had referred Fialkowski to the CLA. We upheld summary judgment for Northeast on the state law claims because nothing more than simple negligence was shown. Id. at 464. Of course that would also have been dispositive of the section 1983 claim. See Davidson v. Cannon, 474 U.S. 344, 347-48, 106 S.Ct. 668, 670-71, 88 L.Ed.2d 677 (1986) (where government official is merely negligent in causing injury, due process is not implicated). We proceeded to hold both that DeShaney precluded recovery under section 1983 because the state owed no affirmative duty of care to a retarded adult voluntarily placed in a state institution and that there was no basis for imposition of supervisory liability. Inasmuch as there was no state compulsion that Fialkowski be in state custody, the application of DeShaney to Fialkowski's case is wholly distinguishable from the case of children compulsorily in school.
 
 
 110
 The only cases in this court presenting the issue of the application of a duty of care to school children are Stoneking v. Bradford Area Sch. Dist., 856 F.2d 594 (3d Cir.1988) (Stoneking I ), vacated sub nom. Smith v. Stoneking, 489 U.S. 1062, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989), and Stoneking II, 882 F.2d 720 (3d Cir.1989). It is clear from reading Stoneking II that this court did not hold that DeShaney precluded the application of a special relationship between the state entity and school children. In fact we said, "[a]rguably, our earlier discussion noting that 'students are in what may be viewed as functional custody of the school authorities' during their presence at school because they are required to attend under Pennsylvania law, see [Stoneking I ] 856 F.2d at 601 (citing 24 Pa.Stat.Ann. § 13-1327 (Purdon Supp.1988)), is not inconsistent with the DeShaney opinion." Stoneking II, 882 F.2d at 723.
 
 
 111
 Although we also stated that we could no longer rely on the affirmative duties of care and protection imposed by the state on its agents, the school district and its employees, which had been one of the bases of Stoneking I, we did not preclude the possibility of a constitutional duty on the school district to protect school children, compelled by state law to attend school.[7] Id. at 723-24. It follows therefore that in the absence of further elucidation by the Supreme Court of the parameters of the duty to protect discussed in DeShaney, this court is free to interpret whether there is such a duty in light of generally applicable legal principles.
 
 IV.
 
 112
 The majority's restrictive view of the "special relationship" first posited in Martinez is particularly troubling, not only because it is based on the erroneous premise that its decision is compelled by precedent but also because it is so sweeping that it is unlikely that any state-imposed restraint of personal liberty short of incarceration or involuntary commitment will trigger the duty to protect. As a result, substantive due process protection from injuries like those at issue is irretrievably lost for all others, including school children, even though the state both created the children's dependency on the state institution by virtue of laws compelling them to attend and maintains the environment within that institution that played a direct role in the harm ultimately caused.
 
 
 113
 There is no doubt that this case falls between DeShaney and Estelle/ Youngberg. I would be more cautious than is the majority in stepping in the direction of complete abandonment of recourse to substantive due process. As Justice Powell has written, "[a]ppropriate limits on substantive due process come not from drawing arbitrary lines but rather from careful 'respect for the teachings of history [and] solid recognition of the basic values that underlie our society.' " Moore v. City of East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977) (plurality opinion) (quoting Griswold v. Connecticut, 381 U.S. 479, 501, 85 S.Ct. 1678, 1691, 14 L.Ed.2d 510 (1965) (Harlan, J., concurring)).
 
 
 114
 Of course, as Justice Powell noted in Moore, "[t]here are risks when the judicial branch gives enhanced protection to certain substantive liberties without the guidance of more specific provisions in the Bill of Rights.... [This] counsels caution and restraint." Id. at 502, 85 S.Ct. at 1937. But a state official's potential liability for violations of substantive due process has already been circumscribed by decisions imposing high standards of culpability, see Davidson, 474 U.S. at 347-48, 106 S.Ct. at 670-71, limitations on the type of conduct for which state entities can be held responsible, see City of Canton v. Harris, 489 U.S. 378, 385-92, 109 S.Ct. 1197, 1202-06, 103 L.Ed.2d 412 (1989), and qualified immunity for individual defendants. See Harlow v. Fitzgerald, 457 U.S. 800, 813-20, 102 S.Ct. 2727, 2735-39, 73 L.Ed.2d 396 (1982). These decisions make it unlikely that a holding that schools have a duty to protect school children while they are in the functional custody of the school will markedly expand the liability of the school districts.
 
 
 115
 Thus, in this case I would find that the plaintiffs have sufficiently pled facts alleging a breach of the duty to protect triggered by the special relationship that arises between vulnerable school children and their public schools. Therefore, I need not decide the contours of the duty in all situations except to note that the extent of such a duty would necessarily be commensurate with the lesser custody exercised by schools over school children than prisons over inmates. Of course, there may be situations where the schools can show that the premises underlying the duty to protect were inapplicable to particular students who, because of their maturity or other circumstances, could have effectively secured help.[8] Unless that is shown, then we owe immature school children attending public school who are seriously injured as a result of a policy of deliberate indifference to their danger no less a remedy than we are willing to provide to incarcerated criminals.
 
 
 116
 BECKER, Circuit Judge, dissenting.
 
 
 117
 I agree with most of Chief Judge Sloviter's analysis, but write separately because I do not agree that we should adopt a bright-line rule imposing on schools a "constitutional duty to protect ... the liberty interests of students while they are in the state's functional custody." In my view, this case does not require such a broad rule, and I would not advocate adopting one.[1] Instead, I believe that the unique circumstances of this case imposed a constitutional duty on the school to protect the students' liberty interests for a combination of reasons: state law compelled the student to attend school; the student, by reason of her disability, lacked the capacity for mature judgment; and the school took affirmative steps to confine the student to situations where she was physically threatened. Although I do not believe that such a duty arises in every school situation, I have no difficulty deciding that it did arise here, where the school knowingly confined D.R. to a dangerous unisex bathroom and a chaotic classroom where she was repeatedly assaulted. Based on all of the circumstances present in this case, I would reverse the judgment of the district court.
 
 
 
 [1]
 Because of our disposition of this appeal, we need not decide whether L.R., the parent of plaintiff D.R., has a legally cognizable constitutional claim in her individual right
 
 
 [2]
 These individuals are William Goode and James Bazzell, both building administrators, the classroom student teacher, Susan Peters, and guidance counselors Martha Richino and Christina Tuttle
 
 
 [3]
 There is no record evidence to demonstrate that students Fambro, Freeman, Miller, Sperling and Sutphin were served with process or entered an appearance. Persons who are not served and do not appear are not parties to an action and thus do not prevent the judgment from becoming final. DeTore v. Local Number 245, 615 F.2d 980, 982, n. 2 (3d Cir.1980)
 
 
 [4]
 Plaintiffs also asserted §§ 1986 and 1988 claims, but they are not pressed on appeal
 
 
 [5]
 Plaintiff, D.R., attended graphics occupation classes at Middle Bucks pursuant to an arrangement between Penn Ridge and Unit No. 22. The districts arranged her placement due to her status as an "exceptional" student under Pennsylvania law. Pa.Stat.Ann. tit. 24 § 13-1371 (1962 & Supp.1991). She was accorded exceptional student status because of her hearing impairment and related communication problems
 
 
 [6]
 School defendants Middle Bucks, Penn Ridge, Goode, Bazzel, Peters, Richino, along with student defendants Gallagher and Ratcliffe filed Rule 12(b)(6) motions to dismiss the amended complaints which were granted by the district court's order. The parties stipulated that school defendants Unit No. 22 and Tuttle would be deemed to have filed timely 12(b)(6) motions as well. The court then dismissed Unit No. 22 and Tuttle on that basis
 
 
 [7]
 This court stated in Black v. Bayer, 672 F.2d 309 (3d Cir.1982), that the affirmative defense of qualified immunity could not be successfully asserted through a 12(b)(6) motion since it must be developed by affidavits at the summary judgment stage or at trial. Id. at 316. We think that subsequent Supreme Court rulings have so undermined the rule enunciated in that case, that it is no longer viable. See, Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); see e.g., Hidahl v. Gilpin County DSS, 938 F.2d 1150, 1155 (10th Cir.1991)
 
 
 [8]
 It is unclear on this record whether defendants Richino and Tuttle are also entitled to the benefit of the qualified immunity defense but it is moot in view of our decision
 
 
 [9]
 The district court did not specify which 12(b)(6) motions of the defendants it granted. Thus, it appears that its order applied to all motions to dismiss for failure to state a claim, including those of student defendants Gallagher and Ratcliffe. It is clear that § 1983 actions may only be maintained against persons acting under color of state law. Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). There is no such allegation as to students Gallagher and Ratcliffe. Thus, it is clear that the complaints failed to state a federal claim against them
 
 
 [10]
 At one point, a court order placed Joshua in the temporary custody of the hospital where he was receiving treatment. A team of specialists determined, however, that there was insufficient evidence of child abuse for the state to retain custody over Joshua
 
 
 [11]
 Justice Brennan, dissenting in DeShaney, noted that, "[c]ases from the lower courts also recognize that a State's actions can be decisive in assessing the constitutional significance of subsequent inaction. For these purposes, moreover, actual physical restraint is not the only state action that has been considered relevant." DeShaney, 489 U.S. at 205, 109 S.Ct. at 1008 (Brennan, J., dissenting) (citing White v. Rochford, 592 F.2d 381 (7th Cir.1979))
 
 
 [12]
 The same is true of plaintiffs' reliance upon alleged violations of other state law duties under the Pennsylvania School Code and the common law. Stoneking v. Bradford Area School District, 882 F.2d 720, 723 (3d Cir.1989), cert. denied, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990) (After DeShaney, "we can no longer rely on the statutory and common law duties imposed in Pennsylvania on school officials as the basis of a duty to protect students from harm occurring as the result of a third person.")
 
 
 [13]
 In view of our affirmance of the order of the district court dismissing the complaints, we need not decide whether different standards of culpability might apply among the school defendants
 
 
 [1]
 For example, D.R.'s complaint alleged that the boys filmed each other "touching and grabbing various parts of the female students' bodies, signs on which profanities were written, one of the [boys] 'mooning' the camera (i.e., exposing his bared backside)." App. at 223
 
 
 [2]
 One commentator has suggested that "[a] proper analysis should look to the[ ] implications of custodial control, rather than only to the control itself, because it is the underlying dependency that actually obligates the state to act, not the state's legal status as custodian." See Note, Affirmative Duties in the Public Schools after DeShaney, 90 Colum.L.Rev.1940, 1957 (1990)
 
 
 [3]
 D.R. was sixteen at the time of the incidents alleged in their complaint. Although L.H. at seventeen may not have been compelled to attend school, I see no reason to draw an age distinction between students who, in fact, are attending a state school
 
 
 [4]
 Only 12 percent of the school-age population is enrolled in private schools. See Muriel Cohen, A Schooling Tradition Turns 350 Today, Boston Globe, April 14, 1992, at 24
 
 
 [5]
 This is analogous to the court's discussion of choice versus compulsion in Lee v. Weisman, --- U.S. ----, ----, 112 S.Ct. 2649, 2658, 120 L.Ed.2d 467 (1992), where the Court, rejecting the argument that there is no compulsion accompanying a high school graduation ceremony, stated "[l]aw reaches past formalism. And to say a teenage student has a real choice not to attend her high school graduation is formalistic in the extreme."
 
 
 [6]
 These facts appear in the record of the juvenile hearing before the state judge at which the perpetrators were found to be delinquent. The transcript of the state proceeding was attached to defendants' motion to dismiss
 
 
 [7]
 The statement in Fialkowski that in Stoneking II "this court recognized that 'an affirmative constitutional duty to provide adequate protection' must be confined to cases in which a person is taken into state custody against his will," 921 F.2d at 466, is simply without support in Stoneking II. Nothing on the page in Stoneking II cited in Fialkowski for that proposition so states. See 882 F.2d at 723. The only arguably relevant reference is the discussion that DeShaney stated that " 'when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.' " Id. (quoting DeShaney, 489 U.S. at 199-200, 109 S.Ct. at 1005). As I have already noted, this is a far cry from stating that the constitutional duty must be confined to such instances. See supra p. 1366
 
 
 [8]
 Cf. Ohio v. Akron Center for Reproductive Health, 497 U.S. 502, ----, 110 S.Ct. 2972, 2979, 111 L.Ed.2d 405 (1990) (judicial bypass procedure in statute requiring parental consent to abortion for minor can require demonstration of minor's maturity)
 
 
 [1]
 One could read Chief Judge Sloviter's later statement that she "need not decide the contours of the duty in all situations" and her accompanying explanation as diluting that rule, but I take her at face value