Jane DOE, Plaintiff–Appellee,

v.

TAYLOR INDEPENDENT SCHOOL
DISTRICT, et al., Defendants,

and

Mike Caplinger and Eddy Lankford,
Defendants–Appellants.

No. 90–8431.

United States Court of Appeals,
Fifth Circuit.

Oct. 2, 1992.

Eric W. Schulze and Laurie Maniotis Rodriguez Hairston, Walsh, Anderson, Underwood & Schulze, P.C., Austin, Tex., for defendants-appellants.

Gwendolyn H. Gregory, Deputy Gen. Counsel and August W. Steinhilber, Nat. School Boards Ass'n, Alexandria, Va., for amicus, Nat. School Boards Ass'n.

Brian D. East, Ellen Hahn, Daves, Hahn & Levy and Vella M. Fink and B. Craig Deats, Van Os, Deats, Robinett & Owen, P.C., Austin, Tex., for plaintiff-appellee.

Before GOLDBERG, HIGGINBOTHAM, and DAVIS, Circuit Judges.

GOLDBERG, Circuit Judge:

You would think it obvious that sexual molestation, when visited upon one of our schoolchildren by her public schoolteacher, would undoubtedly violate her constitutional right to be free from intrusions into bodily integrity. You would also think it indisputable that a school superintendent and a school principal, once aware that such reprehensible conduct was taking place on their campus, would have not only a moral duty, but also a legal duty, to stop it—that the Constitution would not tolerate their looking the other way or taking only meager measures to protect a 14 year-old schoolgirl from being sexually abused by one of their subordinates. Yet we are being asked to conclude, quite to the contrary, that what we deem to be patently obvious, was not so obvious to these school officials, when, in 1986–87, they learned that plaintiff Jane Doe,[1] then only a freshman at Taylor High School, was being sexually molested by her biology teacher.

We hold that Jane Doe had a firmly established constitutional right under the due process and equal protection clauses of the Fourteenth Amendment to be free from sexual molestation by a state-employed schoolteacher, that the superintendent and principal had an affirmative, constitutionally-based duty to protect her from such an intrusion into her bodily integrity, and that a genuine dispute of material fact exists as to whether the superintendent and principal acted with deliberate indifference toward Jane Doe's firmly established consti-

---

1. That is not her real name, of course, but she is so named in order to protect her identity.

tutional rights. We therefore remand this case to the district court for trial.

## I. FACTS [2]

Lynn Stroud, a teacher and coach for almost twenty years, was employed by the Taylor Independent School District from 1981 until 1987. It was no secret within the school community that Coach Stroud had developed romantic affections for a number of young female students over the course of his tenure at Taylor High. He made little effort to conceal his fancy for his female students, writing explicit love notes to them, letting them drive his truck, exhibiting explicit favoritism in class toward them, and physically touching them in a manner not becoming a schoolteacher. As early as 1985, complaints about Coach Stroud's behavior reached the offices of the principal and superintendent through various channels.

Enter Jane Doe, a freshman at Taylor High School in the 1986–87 academic year. Coach Stroud became enamored with her to the point of obsession. He began his seduction of her by writing suggestive comments on test papers. He would give her high grades without requiring that she do any work at all. He would take her and other female students out to lunch during the school day and buy them alcoholic beverages—something he did quite often for his female students. Not surprisingly, all of this flattered Jane Doe, and she developed a "crush" on Coach Stroud.

By late fall, Stroud was touching and kissing Jane Doe. It began with a kiss on her cheek as she was leaving the school field house one day. Eventually, he began taking her into the laboratory room adjacent to the classroom and to the field house where he would kiss and touch her. The kissing and touching escalated to heavy petting and undressing when, in January 1987, Stroud took Jane Doe to a rock con-

cert. There, Stroud bought her an alcoholic beverage, took her back to the field house, and began caressing her in the most intimate of ways. He suggested intercourse, but she refused.

On Valentine's Day, Stroud gave Jane Doe a Valentine which read: "To my most favorite, prettiest, sweetest, nicest sweetheart in the world! Please don't change cause I need you. I'm in love with you. Forever—for real—I love you." A friend and classmate of Jane Doe's, Brittani B., found the Valentine in Doe's purse and took it to the principal, defendant-appellant Eddy Lankford. Brittani told Principal Lankford that she suspected that Stroud was sexually involved with Jane Doe. Principal Lankford acknowledged that he was aware of rumors concerning Doe and Stroud but indicated that Stroud just had a way of flirting with the girls. In response to the Valentine, Principal Lankford transferred *Brittani* (not Jane Doe) out of Stroud's class, but did not investigate the matter further.

After a Valentine's Day dance, Jane Doe spent the night at Stroud's home; Doe had befriended Stroud's daughter, and Stroud had invited Doe to spend the night. While Doe was there, Stroud suggested to her that they have intercourse. Once again, she refused. She spent several nights at the Stroud home over the course of the next two months. Each time, Stroud would tell her that it would be "okay" for them to have sexual intercourse, and each time she would say no.

One week after the Valentine's Day dance, the superintendent of Taylor Independent School District, defendant-appellant Mike Caplinger, learned from another school official that Stroud was behaving "unprofessionally" with Jane Doe at a school basketball game. Superintendent Caplinger, Principal Lankford, and the athletic director spoke with Stroud about the

---

2. Because this case is on appeal from the denial of a motion for summary judgment, our review of the record is plenary. We are constrained to review the facts in the light most favorable to the nonmoving party in the court below, here, Jane Doe. *See International Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1263 (5th Cir.1991),

cert. denied, —— U.S. ——, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992). Our recitation of the facts, therefore, is predictably slanted in her favor. Any disputes of fact must, of course, be resolved in Jane Doe's favor in determining whether the appellants are entitled to summary judgment. *See id.*

matter. Troubled by allegations of sexual misconduct on the part of Stroud, the athletic director had already taken it upon himself to speak with Stroud on previous occasions, and so informed Principal Lankford. According to Principal Lankford, Superintendent Caplinger was informed of the several reports concerning Stroud. Nevertheless, Stroud remained in the employ of Taylor High.

By March or April, 1987, Stroud's persistence in seducing Jane Doe finally proved fruitful; he and Jane Doe had sexual intercourse. Doe was fifteen years old at the time, and Stroud was her first sexual partner. As Jane Doe deposed, she "gave into" Stroud because she was "just tired of the pressure," sensing that Stroud was getting mad at her for not having sex with him; she was afraid of losing their friendship altogether.

Over the course of the next several months, Stroud and Doe had repeated sexual contact at different locations, both on and off the school grounds. At least twice, they engaged in oral sex. Their romantic relationship (although perhaps not the extent of it) was common knowledge within the Taylor High community, not only among students, but also among parents, faculty, and the two athletic directors. Jane Doe was reluctant to refuse Stroud's sexual advances out of fear that he would alienate her completely.

In June 1987, Stroud took Doe and some other girls to a festival where, once again, he provided them with alcoholic beverages. One girl became intoxicated. Stroud began dancing with Doe, angering Stroud's wife. Stroud took Doe out to a field, had sexual intercourse with her, took her (along with his daughter and the intoxicated girl) back to his home, and had sexual intercourse with Doe again later that night. Two concerned parents witnessed Stroud's behavior at the festival and reported the incident to Superintendent Caplinger. They also informed Superintendent Caplinger that Stroud exhibited favoritism toward female

students in class. Superintendent Caplinger did not contact Jane Doe's parents to discuss the episode with them.[3]

If by then it was not plain to Superintendent Caplinger and Principal Lankford that something at Taylor High was terribly wrong, on July 15, 1987 the sirens should have sounded. Doe's parents discovered photographs of Stroud among Doe's possessions with such handwritten inscriptions by Stroud as: "Please don't ever change and don't ever leave me. I want to be this close always—I love you—Coach Lynn Stroud." Doe's parents immediately brought the signed photographs to the attention of Superintendent Caplinger. Superintendent Caplinger confirmed to Doe's parents that he was aware of rumors concerning Coach Stroud; indeed, several concerned parents had contacted the principal's office to request that their children not be assigned to Stroud's biology class. Superintendent Caplinger told Jane Doe's parents that he would convene a meeting of all parties involved. Although no such meeting took place, Caplinger met with Jane Doe. He showed her the photographs and inquired as to the nature of her relationship with Stroud. Doe suggested that the note on the photograph was just a "friendly gesture" and explicitly denied any sexual relations with Stroud. Principal Lankford met with Stroud to discuss the matter. Stroud denied any sexual involvement with Doe. With that, Principal Lankford warned Stroud that he would be fired "if something was going on." Superintendent Caplinger and Principal Lankford were apparently satisfied that nothing was going on, based solely on the adamant denials of the alleged culprit (Stroud) and the 15 year-old victim (Jane Doe).

Although Jane Doe was able to stay away from Stroud for the remainder of the summer, when classes resumed in the fall, Stroud's sexual advances towards Jane Doe resumed as well, and, once again, Stroud was having sexual intercourse with her.

---

**3.** Superintendent Caplinger allegedly telephoned the parents of one of the girls who, according to the report by the two concerned parents, was supposedly at the festival. Because the parents of the girl told him that their daughter was not at the festival, Superintendent Caplinger summarily dismissed the entire report without investigating the episode further.

The sexual contact continued through the fall of Jane Doe's sophomore year, until October 5, 1987, when Jane Doe's mother found more love letters from Stroud. Suspicious about her daughter's relationship with Stroud, she consulted with her family lawyer who agreed to discuss the matter with Jane Doe. Meeting with Jane Doe for the first time, the attorney learned the truth about her sexual involvement with Stroud. Jane Doe explained that she had kept the matter a secret all this time because she feared the repercussions of disclosure. The attorney reported this information to Superintendent Caplinger at once. Coincidentally, on that same day, another schoolgirl contacted Caplinger to report that she too had been victimized by Stroud; he had made unwelcome sexual advances towards her, as well. Stroud was suspended without pay, later resigned, and pled guilty to criminal charges in connection with this incident.

## II. PROCEDURAL HISTORY

Jane Doe brought this civil rights lawsuit against Stroud, the school district, Superintendent Caplinger, and Principal Lankford alleging a variety of state law claims, a due process claim, and an equal protection claim. Following the denial of their motion for summary judgment on qualified immunity grounds, Superintendent Caplinger and Principal Lankford appealed. *See Mitchell v. Forsyth,* 472 U.S. 511, 529–30, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985) (denial of qualified immunity is an immediately appealable order). In their motion for summary judgment, and in their briefs on appeal to this court, the appellants (Superintendent Caplinger and Principal Lankford) have contended that they are entitled to qualified immunity on the constitutional claims because Jane Doe was not deprived of any clearly established constitutional right when she was sexually molested by Coach Stroud, that they had no constitutional duty to protect her from Coach Stroud, and that their conduct in connection with the allegations of sexual misconduct was objectively reasonable.

■ There is no dispute that the burden of establishing an entitlement to qualified immunity is on Superintendent Caplinger and Principal Lankford, the officials seeking to invoke it. *Stoneking v. Bradford Area School Dist.,* 882 F.2d 720, 726 (3d Cir.) (*"Stoneking II"*), *cert. denied,* 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990). They "must show that their conduct did 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Thus, Superintendent Caplinger and Principal Lankford must demonstrate that "reasonable officials in [their] position at the relevant time could have believed, in light of clearly established law, that their conduct comported with established legal standards." *See id.; accord Jefferson v. Ysleta Indep. School Dist.,* 817 F.2d 303, 305 (5th Cir.1987).

## III. DUE PROCESS

### A. Clearly Established Constitutional Right

The alleged constitutional violation in this case is the failure of Superintendent Caplinger and Principal Lankford to protect Jane Doe from the sexual molestation visited upon her by Coach Stroud, a subordinate of Caplinger and Lankford's. The inquiry can be divided into two discrete questions: first, whether sexual molestation of a schoolchild rises to the level of a constitutional deprivation, and second, whether top-level school officials owe the students entrusted to their care some affirmative duty of protection from such an assault on the students' constitutional rights.

#### 1. *Sexual Molestation*

■ We begin with the familiar notion that the Constitution forbids a state actor from arbitrarily yet intentionally inflicting physical injury upon a person. A state actor cannot simply beat someone senseless absent some justification. Nor can a state actor use means which "shock the conscience" in the name of the public good.

*See Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (police could not pump a suspect's stomach in order to retrieve evidence). Such conduct and methods plainly implicate the substantive component of the Due Process Clause of the Fifth and Fourteenth Amendments because they intrude upon an individual's liberty interest to be free from bodily abuse. *See Jefferson,* 817 F.2d at 305.

■ Even when constitutional liberty interests are implicated, not all bodily injuries caused by state actors give rise to a *constitutional* tort, for it is well settled that mere negligence on the part of a state actor does not constitute a deprivation of due process under the Constitution. *Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). An intentional tort does work a deprivation, as does tortious conduct exceeding mere negligence but not quite rising to the level of intentional, *e.g.,* deliberate (or conscious) indifference, recklessness or gross negligence. *See Sivard v. Pulaski County,* 959 F.2d 662, 669 (7th Cir.1992) ("A § 1983 claim must be based on deliberate indifference, not on mere inadvertence."); *Lopez v. Houston Indep. School Dist.,* 817 F.2d 351, 355 (5th Cir.1987) (liability only where state actors are "grossly negligent or deliberately indifferent"); *see generally Temkin v. Frederick County Comm'rs,* 945 F.2d 716, 722–23 (4th Cir.1991) (collecting cases from around the circuits), *cert. denied,* — U.S. —, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992).

■ In the context of torts committed against children in the school environment, the Fifth Circuit in *Jefferson* held that a public school teacher violated the constitutional rights of a schoolchild by lashing a child to a chair for a protracted period of time, without any justification whatsoever. *Id.* The court grounded its holding on the schoolchild's constitutional liberty interest to be free from bodily restraint. *Id.* The Fifth Circuit has also held that the infliction of "corporal punishment in public schools is a deprivation of substantive due process when it is arbitrary, capricious, or wholly unrelated to the legitimate state goal of maintaining an atmosphere conducive to learning." *Fee v. Herndon,* 900 F.2d 804, 808 (5th Cir.) (quoting *Woodard v. Los Fresnos Indep. School Dist.,* 732 F.2d 1243, 1246 (5th Cir.1984)), *cert. denied,* — U.S. —, 111 S.Ct. 279, 112 L.Ed.2d 233 (1990); *see generally Ingraham v. Wright,* 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977) ("[W]e find that corporal punishment in public schools implicates a constitutionally protected liberty interest...."). It is quite clear from our circuit's jurisprudence that the Constitution forbids schoolteachers from physically assaulting our schoolchildren absent some legitimate punitive or disciplinary purpose. *Jefferson,* 817 F.2d at 305.

From these basic principles it necessarily follows that *the Constitution* proscribes public school teachers from sexually molesting our schoolchildren. We concede that there is no case in our circuit directly standing for that proposition. No matter, for "it is not necessary to point to a precedent which is factually on all-fours with the case at bar." *Id.* As Judge Posner has explained:

> The easiest cases don't even arise. There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances.

*K.H. Through Murphy v. Morgan,* 914 F.2d 846, 851 (7th Cir.1990).

If it is unconstitutional for a public school teacher to tie a child to a chair, *e.g., Jefferson,* 817 F.2d at 305 or to arbitrarily paddle a student on his behind, *see Woodard,* 732 F.2d at 1246, and if a state actor may not intentionally assault a person without justification, then surely it is unconstitutional for a public school teacher to sexually molest a schoolchild. We take no great leap in coming to this conclusion. The Third Circuit has also recognized that a schoolchild has a constitutional liberty interest to be free from sexual molestation:

A teacher's sexual molestation of a student is an intrusion of the school-child's bodily integrity not substantively different for constitutional purposes from corporal punishment by teachers. Reasonable officials would have understood the "contours" of a student's right to bodily integrity, under the Due Process Clause, to encompass a student's right to be free from sexual assaults by his or her teachers.

Since a teacher's sexual molestation of a student could not possibly be deemed an acceptable practice, as some view teacher-inflicted corporal punishment, a student's right to be free from such molestation may be viewed as clearly established even before *Ingraham* [*v. Wright* was decided in 1977].

*Stoneking II*, 882 F.2d at 727 (citations omitted). The Tenth Circuit shares that view. *See D.T. by M.T. v. Indep. School Dist. No. 16*, 894 F.2d 1176, 1187 (10th Cir.) (observing that "act of sexual molestation" is a "constitutional tort" but finding school district not liable because schoolteacher was not acting under color of state law when he molested the children during the summer months), *cert. denied*, — U.S. —, 111 S.Ct. 213, 112 L.Ed.2d 172 (1990).

The Third Circuit has also recognized, in the analogous context of institutionalized, mentally handicapped persons, that the "right to freedom from bodily restraint and the right to safe conditions" includes the right not to be sexually molested, and that such a right is "encompassed within the 'liberty' substantively protected by the fourteenth amendment due process clause." *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir.1990). Other circuit courts, confronted with instances of sexual molestation in a variety of contexts, have suggested, some quite explicitly, that such misconduct amounts to a deprivation of due process. *See Yvonne L. v. New Mexico Dept. of Human Services*, 959 F.2d 883, 893 (10th Cir.1992) (holding that children in custody of state have constitutional right to be reasonably safe from harm such as sexual molestation); *Doe v. New York City Dept. of Soc. Services*, 649 F.2d 134, 145–46 (2d Cir.1981) (holding that a state foster care agency has an affirmative duty to protect a child from sexual abuse inflicted by foster parents); *see also Simescu v. Emmet County Dept. of Social Services*, 942 F.2d 372 (6th Cir.1991) (child sexually molested by a man working with a social services agency; agency was deemed a private actor and, thus, not liable under § 1983 because it did not act "under color of state law"); *P.C. v. McLaughlin*, 913 F.2d 1033, 1045 (2d Cir.1990) (staff person sexually assaulted mildly retarded resident at state institution; officials not liable because no evidence of deliberate indifference); *Jane Doe "A" v. Special School Dist. of St. Louis County*, 901 F.2d 642, 646–47 (8th Cir.1990) (bus driver sexually assaulted handicapped students; school district and its officials not liable because no evidence of deliberate indifference).

We think it incontrovertible that bodily integrity is necessarily compromised when a state actor sexually assaults a schoolchild (or anyone for that matter) and that such misconduct implicates due process. Obviously, there is never any justification for sexually molesting a schoolchild, and thus, no state interest, analogous to the punitive and disciplinary objectives attendant to corporal punishment, which might support it.[4] Although we explicitly express this opinion for the first time in this circuit,[5] we harbor no doubt—nor should any school teacher or official—that such a conclusion follows from the well-established jurisprudence governing tortious conduct committed by state actors and the jurisprudence delineat-

---

4. Thus, those cases in this circuit which have held that the infliction of excessive corporal punishment does not violate due process are inapposite. *E.g., Fee v. Herndon*, 900 F.2d 804 (5th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 279, 112 L.Ed.2d 233 (1990), and cases cited therein.

5. In *Spann for Spann v. Tyler Indep. School Dist.*, 876 F.2d 437, 438 (5th Cir.1989), *cert. denied*, 493 U.S. 1047, 110 S.Ct. 847, 107 L.Ed.2d 841 (1990), we assumed *arguendo* that a schoolchild "had a constitutional right to be protected from" sexual molestation, but did not make an explicit proclamation on the subject.

ing the liberty interests enjoyed by our schoolchildren.

### 2. *School Officials' Duty of Care*

Having concluded that Coach Stroud's sexual molestation of Jane Doe violated her firmly established constitutional right to substantive due process, we next consider whether Superintendent Caplinger and Principal Lankford violated Jane Doe's constitutional rights by failing to protect her from Coach Stroud's transgressions. In essence we ask whether school officials have some affirmative duty to protect schoolchildren from tortious conduct by others. This inquiry can be explored from two angles: either from the perspective that school officials are responsible for properly monitoring and disciplining subordinates (such as schoolteachers) over whom they exercise supervisory authority; or from the viewpoint that school officials have a constitutional duty to protect schoolchildren from known or reasonably foreseeable harms occurring during or in connection with school activities.[6] From either standpoint, we find such a duty.

■■■ Supervisory liability can be the basis for Jane Doe's claim against Superintendent Caplinger and Principal Lankford. However, "as supervisory officials [Superintendent Caplinger and Principal Lankford], may not be held liable under § 1983 on a respondeat superior theory for actions of" Coach Stroud. *Lopez v. Houston Indep. School Dist.*, 817 F.2d 351, 355 (5th

Cir.1987). Only their direct acts or omissions can form the basis for liability. *Id.* Causation aside, they are only liable if they failed to fulfill the duty they owed to Jane Doe. Jane Doe must prove:

(1) that the school officials "[r]eceived notice of a pattern of unconstitutional acts committed by subordinates;"

(2) that the school officials "[d]emonstrated deliberate indifference to or tacit authorization of the offensive acts;"

(3) that the school officials "[f]ailed to take sufficient remedial action; and

(4) [t]hat such failure proximately caused injury to [Jane Doe].

*Jane Doe "A" v. Special School Dist. of St. Louis County*, 901 F.2d 642, 645 (8th Cir.1990). When school officials are on "notice of a pattern of unconstitutional acts committed by subordinates," *id.*, the Constitution will not tolerate a practice of deliberate or conscious indifference to the potentiality of harm that is likely to follow. Just as a police chief, sheriff, or warden can, under certain circumstances, be held liable for the misconduct of his officers, deputies, or jailers who violate the rights of those persons with whom they come into contact,[7] so too can a superintendent or principal be held liable when, by his own actions or inactions, he consciously allows a schoolteacher to violate the bodily integrity of a schoolchild. *See Stoneking II*, 882 F.2d at 724–25 (school official can be liable if he "maintains a practice, custom, or poli-

---

**6.** As we shall elaborate *infra*, this duty arises by virtue of state law which compels public school attendance. *See* Tex.Educ.Code Ann. § 21.032 (Vernon 1987) ("Compulsory Attendance"); *Lopez v. Houston Indep. School Dist.*, 817 F.2d 351, 356 (5th Cir.1987) (holding that bus driver could be held liable for failing to break up a fight between school children because he was "entrusted with the care of students attending school under Texas' compulsory education statute.").

**7.** *See Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir.1987) ("Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials "implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation.") (citations and quotations omitted); *accord Har-*

*din v. Hayes*, 957 F.2d 845, 849 (11th Cir.1992) ("A supervisor may be liable under section 1983 if ... the challenged actions are causally connected to a constitutional violation."); *Sample v. Diecks*, 885 F.2d 1099, 1117–18 (3d Cir.1989) (outlining the basis for supervisory liability against prison officials); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 389–90, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) (municipality can be held liable for the torts committed by its police officers where "the failure to train [the officers] amounts to deliberate indifference to the rights of persons with whom the police come into contact."); *cf. Brown v. Grabowski*, 922 F.2d 1097, 1120 n. 16 (3d Cir.1990) (distinguishing *Stoneking II* and *Sample* in finding no supervisory liability against police chief), *cert. denied*, ⸺ U.S. ⸺, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

cy of reckless indifference to instances of known or suspected sexual abuse of students by teachers, in concealing complaints of abuse, and in discouraging students' complaints about such conduct."); *Jefferson*, 817 F.2d at 304–06 (holding that a principal was not entitled to qualified immunity as a matter of law where a teacher tied a second-grader to a chair for an entire day and the better part of another, and such an instructional technique was allegedly imposed by school policy); *cf. Lopez*, 817 F.2d at 355 (holding that supervisory school officials were not liable because there was no evidence of widespread abuse). In sum, school officials can find themselves liable for the malfeasance of their subordinates if they know or should be aware of the transgressions, yet consciously choose not to put an end to them, for such dereliction can only be viewed as implicit condonation of the subordinate's constitutional indiscretion. Of course, there must also be a causal link between the officials' delinquency and the ultimate harm that follows. *Jane Doe "A"*, 901 F.2d at 645; *cf. Collins v. City of Harker Heights, Texas*, — U.S. —, —, 112 S.Ct. 1061, 1069, 117 L.Ed.2d 261 (1992) (explaining that "deliberate indifference" in training employees provides the necessary causal link to hold a municipality liable for the torts of its employees).

Alternatively, school officials can be held liable under § 1983 for the harms suffered by schoolchildren based on a breach of their duty to protect schoolchildren. Ten years ago, the Fifth Circuit addressed the special relationship between public school officials and the schoolchildren compelled to attend public schools. Observing that schoolchildren are "too young to be considered capable of mature restraint," the court explained that a public school

> assumes a duty to protect [the schoolchildren] from dangers posed by anti-social activities—their own and those of other students—and to provide them with an

environment in which education is possible.

*Horton v. Goose Creek Indep. School Dist.*, 690 F.2d 470, 480 (5th Cir.1982) (emphasis added), *cert. denied*, 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983). Although we chose not to ground this "duty to protect" on the doctrine of *"in loco parentis,"* we expressed our view "that school officials have special duties with associated powers." *Id.* at 480–81 n. 18. Five years later, we cited *Horton* with approval in a case holding that a bus driver could be held liable for failing to break up a fight between school children because he was "entrusted with the care of students attending school under Texas' compulsory education statute." *See Lopez*, 817 F.2d at 356 (citing Tex.Educ.Code Ann. § 21.032 (Vernon 1987) ("Compulsory Attendance")). We explained that the bus driver's "failure to protect [the schoolchild] or to render emergency aid [would amount to an] abuse [of] state power, and support[ ] a § 1983 action if ... it rose to the level of callous indifference and was a cause of injury." *Id.*[8]

The Supreme Court's recent decision in *DeShaney v. Winnebago County Dept. of Soc. Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), addressed the contours of this "duty to protect," explaining that an

> affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, *or other similar restraint of personal liberty* —which is the "deprivation of liberty" triggering protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

---

**8.** We also intimated that the supervisory officials could be held liable if they failed to properly train the bus drivers in the face of evidence of a "pre-existing pattern of student fights on buses, constituting a widespread problem mandating an official response." *Lopez*, 817 F.2d at 354.

*DeShaney,* 489 U.S. at 200, 109 S.Ct. at 1006 (emphasis added). Our court has since expounded upon the principles of *De-Shaney,* illuminating that

> [a] special relationship exists "when the State by an affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself." Although the Due Process Clause does not require a governmental body to assist the public, *a duty to provide adequate protective services may arise out of "special relationships" created or assumed by the state with regard to particular individuals.*

*Griffith v. Johnston,* 899 F.2d 1427, 1439 (5th Cir.1990) (emphasis added) (quoting *DeShaney*), *cert. denied,* — U.S. —, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).

A special relationship between the state and a child arises in a variety of contexts: when a child is confined to a state mental health facility;[9] when a state social services agency removes a child from his natural home and places him under state supervision;[10] or when a child has been placed in foster care.[11] In these instances,[12] the state has, to varying degrees, assumed an obligation to protect the child, in much the same way that a capable parent would. A child generally depends on his parents to guard against the dangers of his surroundings. This is a fundamental notion of our organized society and at the heart of what many would dub "family values." By removing the child from his home, even when the child's best interests lie in such action, the state thereby obligates itself to shoulder the burden of protecting the child from foreseeable trauma. *See K.H. through Murphy,* 914 F.2d at 849 ("Once the state assumes custody of a person, it owes him a rudimentary duty of safekeeping no matter how perilous his circumstances when he was free."). For if a state opts to uproot a child from his home environment precisely because his parents are not fit to provide the requisite care and protection, *e.g., K.H. through Murphy,* 914 F.2d at 848, it would be strange, indeed, to countenance the very same neglect simply because it is administered at the hands of the state. *Id.* at 849.

Inasmuch as a state acquires a duty to protect an individual when it "render[s] that individual unable to act for himself," *Shaw,* 920 F.2d at 1144, so too does the state acquire a duty to protect a child when it renders the guardian of that child powerless to act on the child's behalf. So, when the state has in some significant way separated the child from the persons otherwise responsible for taking precautions to shield the child from the social milieu, the state assumes a corresponding duty to provide that protection, for a child is ordinarily incapable of fending for himself. And if state agents, responsible for the well-being of the child, know of an asserted danger to such a child yet consciously fail to safeguard the child from that danger, they will be liable for those injuries sustained by the child provided that the injuries are affirmatively linked to the state agents' nonfeasance. *See Yvonne L.,* 959 F.2d at 890 (defendants liable if they "knew of the asserted danger to [the children] or failed to exercise professional judgment with re-

---

9. *E.g., Youngberg v. Romeo,* 457 U.S. 307, 320, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28 (1982).

10. *E.g., Griffith,* 899 F.2d at 1439.

11. *E.g., Yvonne L.,* 959 F.2d at 890; *K.H. through Morgan,* 914 F.2d at 851; *Taylor by and through Walker v. Ledbetter,* 818 F.2d 791, 795–98 (11th Cir.1987) (en banc), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989); *Doe v. New York City Dept. of Soc. Services,* 649 F.2d 134, 141 (2d Cir.1981). The Supreme Court in *DeShaney* explicitly declined to address the nature of the duty that arises in the foster care context. 489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9.

12. A special relationship also exists in the prison and jail context because prisoners and detainees, as a consequence of the restraints imposed upon them, are rendered incapable of providing for and protecting themselves. Prison officials, therefore, have an affirmative duty to provide necessary services and to protect prisoner and detainees from injuries. *See Estelle v. Gamble,* 429 U.S. 97, 105–06, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976) (convicted prisoners); *Bell v. Wolfish,* 441 U.S. 520, 534, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979) (pretrial detainees); *see also Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244–45, 103 S.Ct. 2979, 2982–83, 77 L.Ed.2d 605 (1983) (arrestees).

spect thereto,, and there is "an affirmative link to the injuries. . . .").

This basis for liability, as this circuit has already intimated in *Horton* and *Lopez*, applies to public school officials, because by compelling a child to attend public school, the state cultivates a special relationship with that child and thus owes him an affirmative duty of protection.[13] Although we too would not equate "a school yard to a prison," *J.O. v. Alton Community Unit School Dist. 11*, 909 F.2d 267, 272 (7th Cir.1990), we nevertheless find a schoolchild to be in the "functional custody" of school officials. *See Stoneking II*, 882 F.2d at 723; *Stoneking v. Bradford Area School Dist.*, 856 F.2d 594, 601 (3d Cir. 1988), *vacated*, 489 U.S. 1062, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989). Separated from his or her parents (guardians), the child's safety and well-being are entrusted to school officials. *Contra D.R. by L.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364, 1372 (3d Cir.1992) (en banc); *J.O. v. Alton*, 909 F.2d at 272; *see supra* note 13. Parents, guardians, and the children themselves have little choice but to rely on the school officials for some measure of protection and security while in school and can reasonably expect that the state will provide a safe school environment. To hold otherwise would call into question the constitutionality of compulsory attendance statutes, for we would be permitting a state to compel parents to surrender their offspring to the tender mercies of school officials without exacting some assurance from the state that school officials will undertake the role of guardian that parents might not otherwise relinquish, even temporarily.

█ In summary, we conclude that public school officials have a duty to police the misconduct of their subordinates and to protect schoolchildren from hazards of which the school officials know or should know. Their deliberate indifference to these duties can form the basis of liability against them. This does not mean that school officials are liable in the ordinary course for injuries to students inflicted by fellow students.[14] We speak here of consti-

---

**13.** *See Horton*, 690 F.2d at 480; *Lopez*, 817 F.2d at 356; *accord D.R. by L.R v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364, 1377, (3d Cir.1992) (en banc) (Sloviter, C.J. joined by Mansmann, Scirica, and Nygaard, JJ., dissenting) ("I would hold that the state compulsion that students attend school, the status of most students as minors whose judgment is not fully mature, the discretions extended by the state to schools to control student behavior, and the pervasive control exercised by the schools over their students during the period of time they are in school, combine to create the type of special relationship which imposes a constitutional duty on the schools to protect the liberty interests of students while they are in the state's functional custody."); *id.* 972 F.2d at 1384 (Becker, J., dissenting) (finding a duty to protect on the particular facts of the case); *Stoneking v. Bradford Area School Dist.*, 856 F.2d 594, 601 (3d Cir.1988) ("Because students are placed in school at the command of the state and are not free to decline to attend, students are in what may be viewed as functional custody of the school authorities. . . ."), *vacated*, 489 U.S. 1062, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989); *Pagano by Pagano Massapequa Public School*, 714 F.Supp. 641, 643 (E.D.N.Y.1989) (holding that elementary school students, who were required by law to attend school, were entitled to some affirmative protection form abuse by other students during the school day"); *see also Stoneking II*, 882 F.2d at 723 ("Arguably, our earlier discussion noting that students are in what may be viewed as functional custody of the school authorities during their presence at school because they are required to attend under Pennsylvania law ... is not inconsistent with the *DeShaney* opinion."). *But see D.R. by L.R.*, 972 F.2d at 1372 (en banc) ("[T]he school defendants' authority over D.R. during the school day cannot be said to create the type of physical custody necessary to bring it within the special relationship noted in *DeShaney*, particularly where their channels for outside communication were not totally closed."); *J.O. v. Alton Community Unit School Dist. 11*, 909 F.2d 267, 272–73 (7th Cir.1990) (concluding that school officials have no duty to protect schoolchild from sexual abuse by teacher, reasoning that "compulsory school attendance [does not] make[ ] a child unable to care for basic human needs. . . . Schoolchildren are not like mental patients and prisoners such that the state has an affirmative duty to protect them."); *Dorothy J. v. Little Rock School District*, 794 F.Supp. 1405 (E.D.Ark.1992) (same).

**14.** The precise contours of a school official's duty, as it pertains to injuries inflicted by someone other than a school teacher (or other subordinate), is not before us. *Compare Lopez*, 817 F.2d at 356 (5th Cir.) (finding such a duty) *with D.R. by L.R.*, 972 F.2d at 1372 (3d Cir.) (finding no such duty).

tutional wrongs, not tort principles. The four elements of *Jane Doe "A"*, 901 F.2d at 645, detailed above, must be met. These elements screen the lesser invasions from those of constitutional dimension.

## B. Objective Reasonableness of the School Officials' Conduct

■ All that remains, having concluded that no reasonable school official would have believed that he could act with deliberate indifference towards instances of sexual molestation by a schoolteacher, is to determine whether there is enough evidence in the record from which a jury could conclude that Superintendent Caplinger and Principal Lankford were deliberately indifferent to Jane Doe's clearly established right not to be molested by Coach Stroud. "The deliberate indifference standard requires a showing, in cases alleging that a state actor failed to provide adequate protection, that the state actor was recklessly indifferent, grossly negligent, or deliberately or intentionally indifferent." *Shaw*, 920 F.2d at 1145. Given all of the information that Superintendent Caplinger and Principal Lankford had, we conclude that a jury could find that their response to Jane Doe's predicament was woefully inadequate, thus precluding summary judgment on the issue of qualified immunity.[15]

Appellants make much of the fact that they confronted Jane Doe and Coach Stroud about the allegations and that both of them denied any sexual involvement. According to appellants, that establishes that they were not deliberately indifferent. Hardly, for a jury could conclude that a reasonable school official, faced with repeated allegations of sexual misconduct from a host of sources, would not summarily dismiss the matter solely on the denials of the alleged perpetrator and the fright-

ened, fifteen year old victim.[16] We need not catalog all of the evidence in the record establishing that Superintendent Caplinger and Principal Lankford were on notice; suffice it to say that several members of the faculty approached Principal Lankford about their suspicions and observations, and Superintendent Caplinger was aware of these reports and the rumors around campus that Stroud was getting too close to female students (Jane Doe in particular). Although some of the "rumors" concerning Stroud's misconduct, both with Doe and other students, were not detailed, certainly enough information made its way to the offices of the superintendent and principal concerning Stroud to alert a reasonable school official that something had gone constitutionally awry on their campus—or so a jury could conclude. The Valentine episode, for example, in which Brittani B. informed Lankford about the note and her suspicions concerning the illicit sexual involvement between Doe and Stroud, should have prompted a more profound response than simply transferring Brittani B. out of the class. Principal Lankford failed to document the allegations and did not pursue it with Coach Stroud.[17] A jury could conclude that such a response communicated that school officials were not taking allegations of sexual misconduct seriously. There is simply too much evidence in this record indicating that Superintendent Caplinger and Principal Lankford knew of a pattern of misconduct by Stroud to take this case away from a jury. Furthermore, a jury could conclude that Superintendent Caplinger and Principal Lankford did little to help Jane Doe: They could have contacted Jane Doe's parents, separated Doe from Stroud, kept a more watchful eye on Stroud once the allegations intensified, and disciplined Stroud, if not terminated his employment, sooner than they did.

---

**15.** That the record would also allow a conclusion to the contrary is beside the point at the summary judgment stage for the facts must be considered in the light most favorable to Jane Doe, the non-moving party.

**16.** Although Jane Doe's denials "may be relevant at trial to her credibility or the causation issue, for qualified immunity purposes it is sufficient

that there is adequate evidence that [the school officials] were on notice of complaints of sexual harassment of students by teachers and staff at the school." *Stoneking II*, 882 F.2d at 729.

**17.** There is a factual dispute over whether Principal Lankford reported the matter to Superintendent Caplinger, a question for the jury to decide.

In fairness to these school officials, there is evidence in the record that in July 1987, when approached by Jane Doe's parents, they stepped up their efforts. But this case comes to us on summary judgment, and a jury could find that their *non* feasance up to then, and even after, was not merely negligent, but grossly negligent, reckless, or deliberately (consciously) indifferent; that Superintendent Caplinger's and Principal Lankford's toleration of Stroud's alleged misconduct for so long communicated their tacit condonation of his *mal* feasance.

## IV. EQUAL PROTECTION

The same analysis that militates in favor of sending this case to a jury on Doe's due process claim counsels in favor of sending her equal protection claim to the jury as well. We shall not elaborate at length.

Sexual harassment is a form of sexual discrimination proscribed by the equal protection clause. *Volk v. Coler*, 845 F.2d 1422, 1431 (7th Cir.1988) (citing earlier cases). Although most of the cases on this subject arise in the context of harassment in the work place, there is no meaningful distinction between the work environment and school environment which would forbid such discrimination in the former context and tolerate it in the latter. Women need not endure sexual harassment by state actors under any circumstance, the school setting included. A reasonable school official in 1986 would have known that. *See Volk*, 845 F.2d at 1431 (citing cases); *cf. Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (sexual harassment as a cause of action under Title VII).

Because there is evidence in the record from which a jury could conclude that Superintendent Caplinger and Principal Lankford knew that Stroud was harassing his female students, Caplinger and Stroud are not entitled to qualified immunity as a matter of law. Rumors were abound concerning Stroud's "favoritism" towards his female students, that he was flirtatious with them, and that he treated them differently than he treated his male students. His

sexual advances may have been subtle, even flattering, in some instances (although obviously not that subtle with respect to Jane Doe), but there is evidence that some female students, including Jane Doe, felt awkward about rejecting Stroud's advances. True, Jane Doe told school officials that Stroud's advances were merely friendly gestures. But a jury could conclude (although it might not) that reasonable school officials, cognizant of the widespread allegations concerning Stroud's sexual advances towards female students, would not excuse Stroud's misconduct.

## V. CONCLUSION

School superintendents and principals have a duty to police the halls of our public schools to insure that schoolchildren, who are obliged to attend, have an opportunity to learn and study in a school environment free from sexual molestation and harassment. We therefore remand this case to the district court for trial so that a jury can decide whether Superintendent Caplinger and Principal Lankford should be granted an "excused absence" with respect to their response (or lack thereof) to Jane Doe's predicament.

AFFIRMED and REMANDED.